UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK          Docket No.
----------------------------------------x 08-CV-3371 (DAB)(JCF)
STACEY KIRKLAND a/k/a                   : (ECF CASE)
ZOSERA STACEY KIRKLAND,                 :
                    Plaintiff,          : **PLAINTIFF'S**
                                        : **MEMORANDUM OF LAW**
       -against-                        : **OPPOSING MOTIONS TO**
                                        : **COMPEL ARBITRATION AND**
MANATT, PHELPS and PHILLIPS, LLP; and   : **TO DISMISS OR STAY**
KROLL BACKGROUND AMERICA, INC., d/b/a   :
INFOLINK SCREENING SERVICES, INC.,      : **CORRECTED COPY**
                    Defendants.         :
                                        :
----------------------------------------x


**CORRECTED COPY**

**PLAINTIFF'S MEMORANDUM OF LAW
OPPOSING MOTIONS TO COMPEL
ARBITRATION AND TO DISMISS OR
STAY.**


RONALD B. McGUIRE
Attorney For Plaintiffs
Box 199
511 Avenue of the Americas
New York,N.Y.  10011-8436
(201) 795-0342
ronmcguire@att.net

Dated:  New York, New York
        August 22, 2008

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

    TABLE OF CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

    UNITED STATES CONSTITUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

    STATUTES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.     THE BURDEN OF PROOF IS ON THE PARTY SEEKING TO COMPEL
      ARBITRATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.     The Summary Judgment Standard Applies To A Motion To Compel
          Arbitration With The Party Opposing Arbitration Given The Benefit Of
          The Doubt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          1.     The Court Should Consider Affidavits, Evidence, Exhibits And
               Testimony To Determine A Motion To Compel Arbitration . . . . . . 7

          2.     The Party Seeking To Compel Arbitration Bears The Burden Of
               Proof Under A Summary Judgment Standard . . . . . . . . . . . . . . . 8

          3.     The Parties Are Entitled To A Trial Of Any Disputed Issues Of
               Fact Regarding Whether There Were Two Valid Arbitration
               Agreements Between The Parties . . . . . . . . . . . . . . . . . . . . . . . 8

    B.     The Determination Of Whether The Parties Have Agreed To Arbitrate
          Or Whether A Writing Is An Arbitration Agreement Is Governed By
          State Law While Federal Law Is Used To Interpret The Terms Or Scope
          Of A Valid Arbitration Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.   PLAINTIFF WAS NEVER EMPLOYED BY MANATT AND NEVER
AGREED TO ARBITRATE PRE-EMPLOYMENT ISSUES . . . . . . . . . . . . . .  10

   A.   Plaintiff Was Never Employed By Manatt . . . . . . . . . . . . . . . . . . . . . .  10

   B.   The Application Arbitration Clause Signed By The Plaintiff Was Void
For Lack Of Consideration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

   C.   The Application Arbitration Clause Did Not Encompass Plaintiff's
Claims That Manatt Wrongfully Withdrew Ms. Kirkland's Offer Of
Employment In Violation Of The FCRA and New York State Law . . . . .  12

       1.   The Narrow Scope Of The Application Arbitration Clause Only
Provided For Arbitration Of Claims That Might Have Arisen
After Ms. Kirkland Became An Employee Of Manatt . . . . . . . . .  12

       2.   Any Ambiguity In The Language Of The Application Arbitration
Clause Must Be Construed Against Manatt As The Law Firm
That Drafted The Application . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

   D.   The Plaintiff Did Not Sign Or Assent To The New Terms Proposed By
Manatt In The Offer Letter Arbitration Clause. . . . . . . . . . . . . . . . . . .  16

       1.   The Offer Letter Arbitration Clause Proposes New Terms Not
Included In The Application Arbitration Clause And, If Valid,
Would Constitute A Separate Superseding Agreement Requiring
Mutual Assent And Consideration . . . . . . . . . . . . . . . . . . . . . . .  16

       2.   The Parties Agree That The Offer Letter Arbitration Clause
Constitutes A Completely Separate Agreement And Is Not An
Amendment Or Clarification Of The Original Application
Arbitration Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

       3.   Plaintiff Never Agreed To The New Terms Of The Offer Letter
Arbitration Clause And Her Silence Cannot Be Construed As
Assent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

III.  THE COURT LACKS JURISDICTION TO COMPEL KROLL TO
ARBITRATE BECAUSE KROLL WAS NOT A PARTY TO ANY
ARBITRATION AGREEMENT WITH THE PLAINTIFF . . . . . . . . . . . . . . .  21

A.    Kroll Cannot Avail Itself Of A Non-Existent Arbitration Agreement
      Between Ms. Kirkland And
      Manatt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

B.    There Is No Factual Nexus Between Plaintiff's Claims Against Manatt
      And Her Completely Distinct Claims Against Kroll . . . . . . . . . . . . . . .   21

C.    Plaintiff's Defamation Claim Against Kroll Cannot Be Arbitrated
      Because The Statute Of Limitations Has Expired   . . . . . . . . . . . . . . . . .   22

D.    Kroll Does Not Meet Any Of The Criteria used By Courts To Compel
      Arbitration With A Non-Signatory   . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

IV.   THE COURT SHOULD DENY MANATT'S MOTION TO DISMISS THE
      COMPLAINT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

## TABLE OF APPENDICES

Bell Atlantic Corp. v. CTC Communs. Corp.
      1998 U.S. App. LEXIS 20160 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . .  Appendix A

Mazza Consulting Group, Inc. v. Canam Steel Corp.,
      2008 U.S. Dist. LEXIS 32670
      (E.D.N.Y. April 21, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Appendix B

Owen-Williams v. BB&T Inv. Servs.
      2006 U.S. Dist. LEXIS 52392
      (D.D.C. July 31, 2006)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Appendix C

Roller v. Centronics Corp.
      1989 U.S. Dist. LEXIS 7317, No. 87 Civ. 5715 (JFK)
      1989 WL 71200 (S.D.N.Y. June 22, 1989) . . . . . . . . . . . . . . . . . . . . .  Appendix D

Zaks v. TES Franchising, LLC
      2004 U.S. Dist. LEXIS 12764
      (D.Conn. 2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Appendix E

## TABLE OF AUTHORITIES

### TABLE OF CASES

Adams v. Suozzi
    433 F.3d 220 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Albrecht Chemical Co. v. Anderson Trading Corp.
    298 N.Y. 437, 84 N.E.2d 625 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Alliance Bernstein Inv. Research & Mgmt.
    445 F.3d 121 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

AT & T Techs. v. Communications Workers of Am.
    475 U.S. 643, 89 L. Ed. 2d 648,
    106 S. Ct. 1415 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Bell Atlantic Corp. v. CTC Communs. Corp.
    1998 U.S. App. LEXIS 20160 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . 15

Bensadoun v. Jobe-Riat
    316 F.3d 171 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Campaniello Imports, Ltd. v. Saporiti Italia S.P.A.
    117 F.3d 655 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Choctaw Generation Limited Partnership v.
American Home Assurance Co.
    271 F.3d 403 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Coenen v. R. W. Pressprich & Co.
    453 F.2d 1209 (2d Cir.) cert. denied,
    406 U.S. 949 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Collins & Aikman Prods. Co. v. Building Sys.
    58 F.3d 16 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Cortec Indus. v. Sum Holding L.P.
    949 F.2d 42 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Cowen & Co. v. Anderson
    76 N.Y.2d 318, 558 N.E.2d 27,
    559 N.Y.S.2d 225 (N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Crawford v. Merrill Lynch, Pierce, Fenner & Smith, Inc.
    35 N.Y.2d 291, 319 N.E.2d 408,
    361 N.Y.S.2d 140 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Croman v. Wacholder
    2 A.D.3d 140, 769 N.Y.S.2d 219
    (1st Dep't 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Degraziano v. Verizon
    325 F. Supp. 2d 238 (E.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . 13

Doctor's Assocs. v. Casarotto
    517 U.S. 681, 116 S. Ct. 152,
    134 L. Ed. 2d 902 (1996) . . . . . . . . . . . . . . . . . . . . . . . 14

Fletcher v. Kidder, Peabody & Co.
    81 N.Y.2d 623, N.E.2d 998,
    601 N.Y.S.2d 686 (1993) . . . . . . . . . . . . . . . . . . . . . . . 14

Genesco v. Kakliuchi
    815 F.2d 840 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . 7, 8, 18, 19

John Hancock Life Ins. Co. v. Wilson
    254 F.3d 48 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . 17

Leatherman v. Tarrant Cty. Narcotics Intel., etc.
    507 U.S. 163 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Liberty Management & Constr. v. Fifth Ave. &
Sixty-Sixth St. Corp.
    208 A.D.2d 73, 620 N.Y.S.2d 827
    (1st Dep't 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Mastrobuono v. Shearson Lehman Hutton
    514 U.S. 52, 115 S. Ct. 1212 (1995) . . . . . . . . . . . . . . . . . . . . . . . 15

Mazza Consulting Group, Inc. v. Canam Steel Corp.,
    2008 U.S. Dist. LEXIS 32670
    (E.D.N.Y. April 21, 2008) . . . . . . . . . . . . . . . . . . . . . . . 8

McAllister Bros., Inc. v. A & S Transp. Co.
    621 F.2d 519 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Mehler v. Terminix Int'l Co. L.P.
    205 F.3d 44 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 9

Metropolitan Arts & Antiques Pavilion v. Rogers
Marvel Architects
    287 A.D.2d 372, 731 N.Y.S.2d
    613 (1st Dept 2001) . . . . . . . . . . . . . . . . . . . . . . . 18

Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.
   473 U.S. 614, 105 S. Ct. 3346, 3354,
   87 L. Ed. 2d 444 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Owen-Williams v. BB&T Inv. Servs.
   2006 U.S. Dist. LEXIS 52392
   (D.D.C. July 31, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Raam Fabrics, Inc. v. Robert R. Scott Corp.
   88 A.D.2d 853, 451 N.Y.S.2d
   745 (1st Dept. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Robert Lawrence Co. v. Devonshire Fabrics, Inc.
   271 F.2d 402 (2d cir. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Roby v. Corporation of Lloyd's
   996 F.2d 1353 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Roller v. Centronics Corp.
   1989 U.S. Dist. LEXIS 7317, No. 87 Civ. 5715 (JFK)
   1989 WL 71200 (S.D.N.Y. June 22, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 14

Scher v. Bear Stearns & Co.
   723 F.Supp. 211 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Sisters of St. John the Baptist, Providence Rest
Convent v. Phillips R. Geraghty Constructor
   67 N.Y.2d 997, 494 N.E.2d 102,
   502 N.Y.S.2d 997 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Smith/Enron Cogeneration Ltd. Partnership, Inc. v.
Smith Cogeneration International, Inc.
   193 F.3d 88 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Thomson-CSF, S.A. v. American Arbitration Ass'n
   64 F.3d 773 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Topf v. Warnaco, Inc.
   942 F. Supp. 762, (D.Conn. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.
   241 F.3d 135 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Stein
   452 F. Supp. 2d 230 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 14

World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.
    345 F.3d 154 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Zaks v. TES Franchising, LLC
    2004 U.S. Dist. LEXIS 12764
    (D.Conn. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## UNITED STATES CONSTITUTION

U.S. Const. Seventh Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## STATUTES

## FEDERAL STATUTES

9 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

9 U.S.C. § 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 25

## STATE STATUTES

Corrections Law § 752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Corrections Law § 753 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

CPLR § 215(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CPLR § 7501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Executive Law § 296(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Penal Law §§10(3) to 10(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Penal Law § 195.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Penal Law § 205.30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Penal Law § 240.20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

STACEY KIRKLAND a/k/a
ZOSERA STACEY KIRKLAND,

                 Plaintiff,

       -against-

MANATT, PHELPS and PHILLIPS, LLP; and
KROLL BACKGROUND AMERICA, INC., d/b/a
INFOLINK SCREENING SERVICES, INC.,

                 Defendants.

------------------------------------------------------------------x

Docket No.
08-CV-3371 (DAB)(JCF)
(ECF CASE)

**PLAINTIFF'S
MEMORANDUM OF LAW
OPPOSING MOTIONS TO
COMPEL ARBITRATION AND
TO DISMISS OR STAY**

      <u>**CORRECTED COPY**</u>

       Plaintiff Stacey Kirkland submits this Memorandum Of law In Opposition To Defendants' Motions To Compel Arbitration and Stay or Dismiss.

<u>**PRELIMINARY STATEMENT**</u>

       Plaintiff Stacey Kirkland was never employed by Defendant Manatt, Phelps and Phillips, LLP ("Manatt" or "MP&P") and there was never a binding arbitration agreement between Plaintiff and Manatt. The arbitration clause Kirkland signed on Manatt's application for permanent employment was expressly conditioned "in consideration of my employment." The arbitration clause was therefore void for lack of consideration because Manatt wrongfully withdrew its offer of permanent employment when co-defendant Kroll Background America, Inc. ("Kroll") falsely reported to Manatt that Kirkland had been convicted of two misdemeanors.[1]

       Despite being provided with a copy of the certified criminal court disposition showing that the misdemeanor charges reported as convictions by Kroll had actually been dismissed, Manatt wilfully and maliciously continued to rely on the clearly erroneous background report by Kroll and never hired Kirkland.

       At the time she signed the arbitration clause on Manatt's application in consideration for future permanent employment by Manatt, Kirkland was employed as a temporary paralegal by American Legal Search, LLC ("ALS") working on a temporary  assignment for ALS in Manatt's

---

[1]     InfoLink Screening Services, Inc. ("InfoLink") is a wholly owned subsidary and alter ego of Kroll which sometimes does business under the name of InfoLink.

New York City office.

There is likewise no basis for Kroll's motion to compel arbitration because Kirkland and Kroll never entered into any agreement for any purpose whatsoever. Even if there was a valid arbitration agreement between Kirkland and Manatt, the court does not have jurisdiction to compel Kroll to arbitrate when Kirkland and Kroll never agreed to arbitrate; Kirkland's claims against Kroll arise from different statutes, torts and facts than her claims against Manatt; there is no agency relationship or identity of ownership, management or interest between Manatt and Kroll; and Kirkland's claim of defamation against Kroll would be time barred from arbitration by the statute of limitations under the terms of the arbitration agreement proposed by Manatt.

## THE FACTS

Since 2000 Plaintiff Zosera Stacey Kirkland ("Kirkland") supported herself by working as a contract paralegal who worked for several legal search firms who would place her on temporary assignments at New York City law firms. Declaration of Zosera Stacey Kirkland dated August 4, 2008 ("Kirkland Dec."), ¶5.

One of the legal search firms Kirkland worked with to secure permanent or temporary placements was American Legal Search, LLC ("ALS"). Kirkland Dec., ¶¶3-4. In March of 2007 the managing director of ALS informed Kirkland of an opening for a permanent litigation paralegal at the New York City office of Manatt. Kirkland Dec., ¶12. Kirkland was interviewed by employees of Manatt and on March 16, 2006 a recruiter from Manatt's Human Resources Department offered Kirkland a position as a permanent litigation paralegal at Manatt's New York City office, subject to a background check. Complaint ("Cmp."), ¶13; Kirkland Dec., ¶13. At the time Manatt made its offer Kirkland had already accepted an offer of permanent employment from another law firm and had given notice at her current job. Kirkland Dec. ¶11. Kirkland decided to accept Manatt's offer of permanent it offered her higher starting pay, and a shorter work week pay than the offer she had already accepted, an attractive benefits package and, in Kirkland's opinion, an opportunity to earn more overtime than she would have had at the other firm. Kirkland Dec. ¶15. Consequently, in reliance on Manatt's offer of permanent employment Kirkland decided to

decline the offer she had previously accepted. Kirkland Dec., ¶16.

Although Kirkland would not become an employee of Manatt until her background check was completed, the recruiter from Manatt said that the firm would like Kirkland to begin working as a temporary employee of ALS assigned to Manatt until her background check was completed. Kirkland Dec., ¶13; Cmp. ¶13. Kirkland was subsequently hired by ALS and on March 19, 2007 Kirkland began working at Manatt as a temporary paralegal employed by ALS. Kirkland Dec., ¶17; Cmp. ¶14. It was not until she had finished work on March 19th that Kirkland filled out an employment application for employment at Manatt. Kirkland Dec. ¶17.

The only question pertaining to Kirkland's criminal history on the application asked: "HAVE YOU EVER BEEN CONVICTED OF A CRIMINAL OFFENSE (FELONY OR MISDE-MEANOR)" [original capitalization and parentheses]. Kirkland Dec., ¶ 17 and Exh 6 at 1. Kirkland truthfully checked "No" for her answer. Id.

In consideration for her future employment by Manatt, Kirkland also signed an arbitration clause on the last page of the employment application in which she agreed to arbitrate any issue pertaining to her future employment by Manatt or the termination of that employment. Kirkland Dec., Exh. 6 at 6.

Kirkland subsequently received two copies of a letter from Manatt's Managing partner dated March 26, 2007 (the "Offer Letter") formally offering her a permanent position as a litigation paralegal, contingent on the successful completion of her background check. Kirkland Dec., ¶21 and Exh. 8. The Offer Letter requested that Kirkland sign and return one copy to Manatt and included a different arbitration clause (the "Offer Letter Arbitration Clause") which contained materially different additional terms that were not in the original Application Arbitration Clause that Kirkland signed. Kirkland Dec., Exh. 8 at 2.

Kirkland was surprised when she learned that the new Offer Letter Arbitration Clause proposed by Manatt would require any arbitration to take place in Los Angeles. Kirkland Dec., ¶21. When she signed the Application Arbitration Clause Kirkland assumed that any arbitration would occur in New York because she would be working at Manatt's New York City office. Id. Manatt

did not say that the new terms were non-negotiable and Kirkland did not sign the Offer Letter

because, although she wanted to accept Manatt's offer of permanent employment, Kirkland wanted

to negotiate further with Manatt about the Offer Letter Arbitration Clause. Id. Kirkland did not

believe there was any urgency for her to sign the Offer Letter while she was still employed by ALS

because she understood that she could not become a Manatt employee until her background check

was completed and signing the Offer Letter was not a condition for her employment by ALS as a

temporary paralegal. Kirkland Dec., ¶¶21-22. No one at Manatt ever objected to Kirkland's failure

to sign the Offer Letter and she had no reason to believe that her employment by ALS was

dependent on her signing the Offer Letter. Id.

On April 6, 2007 Manatt's Human Resources Coordinator told Kirkland that a

background report prepared for Manatt by InfoLink showed that Kirkland had been convicted of

two misdemeanors which she had not disclosed on her employment application. Cmp., ¶18;

Kirkland Dec., ¶18. See also Declaration of Ronald B. McGuire dated August 5, 2008 ("McGuire

Dec."), Exh. 1 at 3-4. Kirkland denied that she had ever been convicted of a misdemeanor and said

she wanted to correct the erroneous criminal background report by InfoLink. Id.

InfoLink erroneously reported to Manatt that Kirkland was convicted of the

misdemeanors of Resisting Arrest (P.L. § 205.30) and Second Degree Obstruction of Government

Administration (P.L. § 195.05) in case number 2000NY035109 in New York County Criminal court

on May 1, 2000. Cmp. ¶16; McGuire Dec., Exh. 1 at 3-4. However, the misdemeanor charges were

dismissed on that date when Kirkland pleaded guilty to Disorderly Conduct (P.L. § 240.20) which

is a petty violation, not a crime, under New York law. Kirkland Dec. ¶¶ 8-9 and Exh. 3. See P.L.

§§ 10(3) to 10(6). On May 1, 2000 the judge who accepted Kirkland's plea to disorderly conduct

said:

THE COURT:        Your attorney tells me that each of you wishes to plead guilty to disorderly
                  conduct, Penal Law section 240.20, which is a violation and not a crime, and
                  which will not give you a criminal record.
                              * * * *
THE COURT:        Ms. Kirkland, is that what you want to do?

THE DEFENDANT: Yes.

4

Kirkland Dec., Exh 2 at 2, lines 16-19 and at 3, lines 5-7.

On April 11, 2007 Kirkland sent an email to Holly Brown describing the circumstances of her arrest and the fact that the misdemeanor charges that InfoLink reported as convictions were dismissed when Kirkland pled guilty to the petty offense of Disorderly Conduct, which was not a crime. Kirkland Dec., ¶20 and Exh. 7; Cmp. ¶13. However, on April 13, 2007 the Human Resources Director of Manatt's New York office told Kirkland that Manatt was withdrawing its offer of permanent employment pending further investigation and that her temporary assignment at Manatt as an employee of ALS would be terminated effective immediately. Cmp., ¶23; Kirkland Dec., ¶23. No one from Manatt gave Kirkland a copy of the erroneous InfoLink report or told her about her right to dispute information in the report. Cmp., ¶25; Kirkland Dec. ¶25.

On Monday, April 16, 2007, Kirkland obtained a certified disposition of her criminal case from the clerk of the New York County Criminal Court. Kirkland Dec., ¶26  On April 19, 2007 Kirkland's attorney faxed a copy of the certified disposition to Manatt's Senior Associate General Counsel Kelly Firment. Cmp. ¶26; McGuire Dec., Exh. 3; Cmp. The April 19th letter to Ms. Firment also contained the phone number of a supervising clerk at the New York County Criminal Court who could verify the information on the certificate of disposition and instructions for Manatt to obtain its own copy of the certified disposition. Id.

On April 19th Kirkland's attorney also faxed a letter addressed to Judy Lutz of InfoLink to Ms. Lutz and Ms. Firment demanding that InfoLink correct the erroneous information on the background report concerning Kirkland's criminal record, notify any party who had received the report of Info-Link's error and disclose to Kirkland's attorney all information InfoLink possessed pertaining to Kirkland. Cmp. ¶27; McGuire Dec. ¶10 and Exh. 4.[2]

On May 1, 2007 Anna Freeman, an employee of Kroll, faxed a copy of Kirkland's criminal court disposition to Kirkland's attorney and told him that Kirkland's background report would be corrected to expunge the false information that Kirkland had criminal convictions. Cmp.,

---

[2]    The next day, April 20, 2007, Kirkland's attorney faxed a letter to Ms. Lutz and Ms. Firment correcting a minor typographical error in the spelling of Kirkland's name in the original letter. Cmp. ¶29; McGuire Dec., ¶10 and Exh. 5.

¶30; McGuire Dec. ¶13 and Exh. 5. Kirkland's lawyer called Ms. Firment the same day to tell her

that Kroll would be revising the InfoLink report. Cmp. ¶30; McGuire Dec., ¶15.

On May 4th Kirkland's attorney received a faxed letter from Ms. Firment dated May

3, 2007 incorrectly stating that the certificate of disposition faxed to Manatt on April 19th showed

that Kirkland pled guilty to "several charges . . . including disorderly conduct" and falsely stated

that Kirkland failed to disclose her criminal record on her employment application. McGuire Dec.,

Exh. 8 at 2-3. Ms. Firment's letter acknowledged that Kirkland was never an employee of Manatt,

stating:

> Kirkland has never been employed with Manatt in anything other than a temporary
> capacity. Accordingly, following her failure to disclose her criminal record to Manatt
> on her job application, her employment was not "terminated." [Quotation marks in
> original].

McGuire Dec., Exh. 8 at 2.

The May 3rd letter stated that because Kirkland failed to disclose the convictions that

were erroneously reported on the InfoLink report, Manatt was withdrawing its offer and that the

position that Kirkland applied for was no longer available. McGuire Dec., Exh. 8 at 2-3. In a letter

dated May 17, 2007 Ms. Firment stated that Manatt had still not received any correction to the

April 6, 2008 InfoLink report from Kroll and reiterated that the position the Kirkland sought at

Manatt was no longer available. McGuire Dec., Exh. 10.

On May 22, 2007 Kroll faxed a corrected copy of the April 6, 2007 InfoLink report

to Kirkland's attorney. Cmp. ¶33; McGuire Dec. ¶19 and Exh. 11. The corrected InfoLink report

deleted all references to Kirkland's 2000 arrest and disposition. Id. Kirkland's attorney immediately

faxed a copy of the corrected InfoLink report to Ms. Firment the same day he received it. Cmp.

¶33; McGuire Dec. ¶20 and Exh. 12.

## PROCEDURAL HISTORY

On April 4, 2008 Plaintiff filed the Complaint naming Manatt and Kroll as Defen-

dants. Kroll was named in its capacity as owner and alter ego of InfoLink, a wholly owned

subsidiary of Kroll. Cmp. ¶¶2, 11.

The Complaint has eight causes of action. Five causes of action are against Manatt for violating provisions of the Federal Fair Credit Reporting Act (FCRA); New York Corrections Law §§ 752 and 753; New York Executive Law § 296(16) and acting negligently and maliciously to injure Plaintiff based on information Manatt knew or should have known was false. Cmp. ¶¶34-47.

The other three causes of action are directed against Kroll for violations of the FCRA and the New York Fair Credit Reporting Act (NYFCRA) and for defamation. Cmp. ¶¶48-62. Manatt and Kroll are accused of violating different sections of the FCRA. Cf. Cmp. ¶¶34-36 and ¶¶48-54.

The Complaint seeks compensatory and punitive damages, declaratory judgment and injunctive relief on behalf of Kirkland and similarly situated parties and costs and attorney fees. The Court ordered the Defendants to answer the Complaint by June 23, 2008. On that day Manatt filed a motion to compel arbitration and to stay or dismiss the Compliant.[3] On the same day Kroll filed a motion to stay the case and compel Kirkland to arbitrate her claims against Kroll.[4]

## ARGUMENT

### I.

### THE BURDEN OF PROOF IS ON THE PARTY SEEK-ING TO COMPEL ARBITRATION.

A.    **The Summary Judgment Standard Applies To A Motion To Compel Arbitration With The Party Opposing Arbitration Given The Benefit Of The Doubt.**

1.    **The Court Should Consider Affidavits, Evidence, Exhibits And Testimony To Determine A Motion To Compel Arbitration.**

"Determining whether parties have agreed to arbitrate is a factual question." Genesco v. Kakliuchi, 815 F.2d 840, 845 (2d Cir. 1987). See also, U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd., 241 F.3d 135, 145 (2d Cir. 2001). (same). Accordingly, it is appropriate for the

---

[3]    "Manatt Mem." shall refer herein to Manatt's Memorandum of Law In Support Of Defendant Manatt, Phelps and Phillips's Motion To Dismiss Or Stay This Action And Compel Arbitration dated June 23, 2008.

[4]    "Kroll Mem." shall refer to herein Defendant Kroll Background America, Inc.'s Memorandum Of Law In Support Of Its Motion To Stay Proceedings and Compel Arbitration dated June 23, 2008.

Court to consider factual submissions beyond the pleadings.

2.   **The Party Seeking To Compel Arbitration Bears The
     <u>Burden Of Proof Under A Summary Judgment Standard.</u>**

The burden of demonstrating the existence of a valid agreement to arbitrate rests on

the party seeking to compel arbitration. <u>United States v. Stein</u>, 452 F. Supp. 2d 230, 247 (S.D.N.Y.

2006). [Citations omitted].

"[T]he summary judgment standard is appropriate in cases where the District Court is

required to determine arbitrability, regardless of whether the relief sought is an order to compel

arbitration or to prevent arbitration." <u>Bensadoun v. Jobe-Riat</u>, 316 F.3d 171, 175 (2d Cir. 2003).

When a defendant's motion to compel arbitration "is opposed on the ground that no agreement to

arbitrate has been made between the parties, a district court should give the opposing party the

benefit of all reasonable doubts and inferences that may arise." <u>Mazza Consulting Group, Inc. v.

Canam Steel Corp.</u>, 2008 U.S. Dist. LEXIS 32670 (E.D.N.Y. April 21, 2008).

"[A] court asked to stay proceedings pending arbitration in a case covered by the

[Federal Arbitration] Act has essentially four tasks: first, it must determine whether the parties

agreed to arbitrate, [citing <u>Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth Inc.</u>, 473 U.S. 614,

105 S. Ct. 3346, 3354, 87 L. Ed. 2d 444 (1985)]; second, it must determine the scope of that

agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended

those claims to be nonarbitrable, [citing <u>Mitsubishi</u>, 105 S. Ct. at 3355]; and fourth, if the court

concludes that some, but not all, of the claims in the case are arbitrable, it must then determine

whether to stay the balance of the proceedings pending arbitration." <u>Genesco</u>, 815 F.2d at 844.

3.   **The Parties Are Entitled To A Trial Of Any Disputed Issues Of Fact Regarding
     <u>Whether There Were Two Valid Arbitration Agreements Between The Parties.</u>**

As in a summary judgment proceeding, any factual disputes pertaining to the

existence or validity of an arbitration agreement that the Court that can't resolve by exhibits and

affidavits must be determined by an evidentiary hearing. <u>McAllister Bros., Inc. v. A & S Transp.

Co.</u>, 621 F.2d 519, 524 (2d Cir. 1980).

The authority of the court to decide a motion to compel arbitration is derived from 9

U.S.C. § 4 of the Federal Arbitration Act ("FAA") which states in part, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." The requirement of a trial if there is a factual dispute regarding the validity of an arbitration agreement is derived from the Seventh Amendment right to a jury trial in civil controversies. Accordingly, when a court determines that there is a factual dispute over whether the parties entered into a valid arbitration agreement, the court is required to hold an evidentiary hearing or a jury trial of the issue if one of the parties demands a jury trial. See, e.g., McAllister, 621 F.2d at 524.

As will be shown below, there was never a valid arbitration agreement between Manatt and Kirkland because the only arbitration agreement Kirkland signed was expressly conditioned in consideration of her future employment by Manatt and therefore never ripened into an enforceable arbitration agreement because Manatt rescinded its offer of employment. Moreover, the scope of the arbitration agreement signed by Kirkland was expressly limited to disputes arising from her anticipated employment or the termination of her employment and did not include disputes concerning the withdrawal of an offer of employment or other claims arising before Kirkland became an employee of Manatt.

**B.    The Determination Of Whether The Parties Have Agreed To Arbitrate Or Whether A Writing Is An Arbitration Agreement Is Governed By State Law While Federal Law Is Used To Interpret The Terms Or Scope Of A Valid Arbitration Agreement.**

Legal questions regarding interpretation, scope or construction of a valid arbitration agreement are determined exclusively by federal law. Coenen v. R. W. Pressprich & Co., 453 F.2d 1209, 1211, 1212 (2d Cir.) cert. denied, 406 U.S. 949 (1972).

However, if a party opposing a motion to compel arbitration denies the existence of an agreement to arbitrate or claims that there was never a meeting of the minds, then the federal courts must apply state law to resolve the factual dispute. Adams v. Suozzi, 433 F.3d 220, 227 (2d Cir. 2005) ("[w]hen contract formation is at issue in an FAA case, we generally apply state-law principles"); Mehler v. Terminix Int'l Co. L.P., 205 F.3d 44, 48 (2d Cir. 2000) (same).

The interplay of state and federal law in the determination of motions to compel

arbitration was recently summarized by the Second Circuit:

> Both federal and state law apply. First, the Federal Arbitration Act (the "FAA") creates a "body of federal substantive law of arbitrability" applicable to arbitration agreements, such as the one at issue here, affecting interstate commerce. [Citations omitted.] Second, New York contracts law applies, as courts generally look to state law for guidance as they seek to ascertain the parties' intent. [Citations omitted].

Alliance Bernstein Inv. Research & Mgmt., 445 F.3d 121, 125 (2d Cir. 2006).

Manatt concedes that the Application Arbitration Clause which Kirkland signed and the Offer Letter Arbitration Clause, which she did not sign, constitute two separate agreements. See Manatt Mem. at 8 ("[i]n sum, there are two equally enforceable arbitration agreements between Plaintiff and MP&P: in the Employment Application and in the Offer Letter").

As discussed below, Manatt drafted the Application Arbitration Clause to make an applicant's employment by Manatt a condition precedent for the agreement to become effective. Manatt never fulfilled that condition and the language Manatt inserted into the Application Arbitration Clause expressly excludes claims arising prior to Kirkland's employment by Manatt from being subject to arbitration. The unsigned Offer Letter Arbitration Clause was never agreed to by Kirkland, was never relied on by Manatt, and was unsupported by any promise or benefit to Kirkland.

Accordingly, Federal Law should be applied to the construction of the terms of the Application Letter Arbitration Clause and New York State law should be applied to determine whether Kirkland ever agreed to the Offer Letter Arbitration Clause or ever by her conduct led Manatt to detrimentally rely on her agreement to the second arbitration clause.

## II.

## PLAINTIFF WAS NEVER EMPLOYED BY MANATT AND NEVER AGREED TO ARBITRATE PRE-EMPLOYMENT ISSUES.

### A.    Plaintiff Was Never Employed By Manatt.

It is undisputed that Plaintiff was never employed by Manatt. Kirkland Dec. ¶2. See

also McGuire Dec., Exh. 8.[5] When Kirkland worked at Manatt as a temporary litigation paralegal she was employed by ALS, not Manatt. Kirkland Dec. ¶¶3-4.

**B.    The Application Arbitration Clause Signed By The Plaintiff Was Void For Lack Of Consideration.**

While Kirkland was employed by ALS she was asked to complete an employment application for a permanent position as a litigation paralegal at Manatt. Kirkland Dec. ¶17 and Exh. 6. Kirkland signed a limited arbitration clause on the last page of the application stating:

> 5.    **Binding Arbitration.** In consideration of my employment, I understand and agree that in the event of any issue or dispute arising under or involving any aspect or term of my employment at MP&P or the termination of that employment (except for claims for worker's compensation, unemployment insurance, any matter within the jurisdiction of the California Labor Commissioner), both MP&P and I agree that the issue shall be submitted to final and binding arbitration, which is explained in more detail in MP&P's Arbitration Agreement which will be included in MP&P's new hire package.

Kirkland Dec., Exh. 6 at 6.

The language of the Application Arbitration Clause drafted by Manatt and signed by Kirkland was expressly conditioned and limited by the term "[i]n consideration of my employment." Kirkland Dec., Exh. 6 at 6. The Application Arbitration Clause never ripened into an agreement binding on either Manatt or Kirkland because Manatt drafted the Application Arbitration Clause to become effective only in consideration of Kirkland's actual employment. Since Manatt withdrew its offer of employment, the Application Arbitration Clause was void for lack of consideration and was not binding on either party.

It is understandable that Manatt would make employment by Manatt a condition precedent for the Application Arbitration clause to become binding since otherwise, under Manatt's Arbitration procedures, Manatt would be compelled to advance the arbitration costs in excess of a filing fee for any applicant who was denied a job and chose to arbitrate. See Arbitration Procedures,

---

[5]    Manatt's Senior General Counsel admitted in her May 3, 2007 letter to Plaintiff's counsel that:

Kirkland has never been employed with Manatt in anything other than a temporary capacity. Accordingly, following her failure to disclose her criminal record to Manatt on her job application, her employment was not "terminated." [Quotation marks in original].

McGuire Dec., Exh 8.

Kirkland Dec., Exh. 8 at 4.

C.    **The Application Arbitration Clause Did Not Encompass
Plaintiff's Claims That Manatt Wrongfully Withdrew Kirkland's
Offer Of Employment In Violation Of The FCRA and New York State Law.**

    1.    **The Narrow Scope Of The Application Arbitration
Clause Only Provided For Arbitration Of Claims That Might
Have Arisen After Kirkland Became An Employee Of Manatt.**

        The Application Arbitration Clause drafted by Manatt expressly limited the subject matter of arbitration to "any issue or dispute arising under or involving any aspect or term of my employment at MP&P or the termination of that employment . . ." Kirkland Dec., Exh. 6 at 6. The narrow language chosen by Manatt does not include matters pertaining to the withdrawal of an offer of employment or other matters arising before the signatory becomes an employee of Manatt. The narrow language of the claims contemplated under the clause reflects the conditional nature of the clause which was drafted to make employment by Manatt a condition precedent for the Application Arbitration Clause to ripen into an enforceable arbitration agreement.

        By contrast, the arbitration agreements in the cases cited by Manatt where courts enforced arbitration agreements used broader language to describe the subject matter of the agreement and were not conditioned on unfulfilled future consideration. See, e.g., Owen-Williams v. BB&T Inv. Servs., 2006 U.S. Dist. LEXIS 52392, *1, *4 (D.D.C. July 31, 2006) (cited at Manatt Mem. at 11) where the D.C. district court granted a motion to compel arbitration of a plaintiff's claim that the defendant wrongfully withdrew its offer of employment. However, unlike the Application Arbitration Clause, the arbitration clause in Owen-Williams was broadly drafted and supported solely by consideration of mutual promises to arbitrate. The arbitration clause held to be binding by the D.C. district court stated:

> The parties agree that any and all disputes, disagreements, claims, or other conflicts regarding, relating to, or arising out of this Agreement, the Parties' employment relationship, any termination thereof, any employment-related act or practice by Employer or its employees, representatives, or agents, any breach of this Agreement, or any alleged breach of this Agreement, shall be subject and submitted to arbitration.

Owen Williams, 2006 U.S. Dist. LEXIS 52392, *1, *4.

        The Application Arbitration clause drafted by Manatt specifically states that the

agreement is made in consideration of a future act ("my employment") which was never fulfilled.

By contrast, the arbitration clause in Owen-Williams backed by valid consideration in the form of the mutual promise to arbitrate   Moreover, the subject matter of the Owen-Williams arbitration clause encompasses any dispute arising under any aspect of the agreement and is not limited to "any aspect or term of my employment at MP&P or the termination of that employment". Withdrawal of an offer of employment is a pre-employment issue that was within the scope of the broad language of the Owen-Williams arbitration clause but not within the scope of the Application Arbitration Clause drafted by Manatt.

Two non-employment cases cited by Manatt where courts granted motions to compel arbitration likewise involved broad arbitration clauses employing general language, unlike the limited language of the Application Arbitration Clause. See. e.g., Collins & Aikman Prods. Co. v. Building Sys., 58 F.3d 16, 18 (2d Cir. 1995)  (granting motion to compel arbitration in a commercial dispute where the parties had executed a broad arbitration agreement) (cited at Manatt Mem. at 12-13)[6]; Degraziano v. Verizon, 325 F.Supp.2d 238, 241 (E.D.N.Y. 2004) (granting motion to compel arbitration between a consumer and a cellular service provider where the parties had executed a broad arbitration agreement)[7]

Two other inapposite cases cited by the Manatt Mem. involved motions to compel arbitration of claims by former employees alleging wrongful termination and are not relevant to the

---

[6] The arbitration clause in Collins stated:

Any claim or controversy arising out of or relating to this agreement shall be settled by arbitration in the City of New York in accordance with the Rules then obtaining of the American Arbitration Association.

Collins, 58 F.3d at 18.

[7]     The arbitration agreement in DeGraziano stated, in relevant part:

**ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR TO ANY PRIOR AGREEMENT FOR CELLULAR SERVICE WITH US OR, ANY OF OUR AFFILIATES OR PREDECESSORS IN INTEREST, OR TO ANY PRODUCT OR SERVICE PROVIDED UNDER OR IN CONNECTION WITH THIS AGREEMENT OR SUCH A PRIOR AGREEMENT, WILL BE SETTLED BY INDEPENDENT ARBITRATION INVOLVING A NEUTRAL ARBITRATOR . . .**

Degraziano, 325 F.Supp.2d at 241. [Original caps and boldface].

issue of whether the limited scope of the Application Arbitration Clause encompasses an applicant's claim of wrongful withdrawal of an offer of employment.  See, e.g., Roller v. Centronics Corp., 1989 U.S. Dist. LEXIS 7317, No. 87 Civ. 5715 (JFK), 1989 WL 71200 (S.D.N.Y. June 22, 1989) (cited in Manatt Mem. at 8) and Fletcher v. Kidder, Peabody & Co., 81 N.Y.2d 623, 619 N.E.2d 998, 601 N.Y.S.2d 686 (1993) (cited in Manatt Mem. at 12).

The Application Arbitration Clause was one of five clauses Manatt required applicants to initial on page 6 of Manatt's employment application. In one of those paragraphs, the "Authorization to Check References," Manatt chose broad language to waive claims against Manatt and other parties for liability for improper disclosure of information that might result in the applicant's "failure to receive an offer" of employment. See Kirkland Dec., Exh. 6 at 6, the "Authorization To Check References" signed by Kirkland that states in relevant part:

> Furthermore, I hereby release MP&P, my former employers and all other persons from any and all claims, demands or liabilities that may result from such disclosure of information to MP&P, as well as from the use or disclosure of such information on this application, which may result in my failure to receive an offer or, if I am hired, in my termination of employment.

Kirkland Dec., Exh. 6 at 6.

In contrast to the Application Arbitration Clause that was limited to issues arising between Manatt and an employee, the Authorization To Check References expressly applied to applicants as well as employees and the waiver of liability in the Authorization To Check References was drafted to encompass claims arising from, inter alia, an applicant's "failure to receive an offer" of employment. Id.

### 2. Any Ambiguity In The Language Of The Application Arbitration Clause Must Be Construed Against Manatt As The Law Firm That Drafted The Application.

Although Federal and State policy favors the enforcement of valid arbitration agreements, the basic principles of contract law are applied by courts to determine whether an agreement exists and to interpret an agreement's terms. Doctor's Assocs. v. Casarotto, 517 U.S. 681, 686-87, 116 S. Ct. 152, 134 L. Ed. 2d 902 (1996). Accord, United States v. Stein, 452 F. Supp. 2d at 247-248 and n.47 (S.D.N.Y. 2006)

14

As in other contracts, ambiguities in arbitration agreements are construed against the party that drafted the agreement. <u>Mastrobuono v. Shearson Lehman Hutton</u>, 514 U.S. 52, 62, 115 S. Ct. 1212, 1219 (1995) (Construing the terms of an arbitration agreement the Supreme Court held that "respondents cannot overcome the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it"). <u>Accord</u>, <u>Bell Atlantic Corp. v. CTC Communs. Corp.</u>, 1998 U.S. App. LEXIS 20160, *1, *5-*6 (2d Cir. 1998) (affirming denial of motion to compel arbitration because arbitration agreement drafted by movant was ambiguous).[8]

The fact that the drafter of the Application Arbitration Clause is a law firm is also a factor that the Court should consider in construing any ambiguous language in the Application Arbitration Clause. As indicated in the Authorization To check References on the same page, Manatt was fully capable of drafting language encompassing a denial of an offer of employment or other claims that might arise against Manatt by an applicant who was not an employee of the firm. Manatt cannot avoid the implications of the language that Manatt itself created when Manatt expressly drafted the Application Arbitration Clause to be made "in consideration of [applicant's] employment" and limited the applicability of the Application Arbitration Clause to "any aspect or term of [applicant's] employment at MP&P or the termination of that employment", thereby expressly excluding the denial of an offer of employment from the scope of the Application Arbitration Clause.

A mutual promise to arbitrate can be sufficient consideration to support an agreement to arbitrate. <u>Robert Lawrence Co. v. Devonshire Fabrics, Inc.</u>, 271 F.2d 402, 411 (2d cir. 1959); <u>accord</u>, <u>Topf v. Warnaco, Inc.</u>, 942 F. Supp. 762, 767 (D.Conn. 1996). However, while the Application Arbitration Clause drafted by Manatt includes a mutual exchange of promises, Manatt also conditioned the agreement on the consideration of an applicant's future employment by Manatt.

In drafting the Application Arbitration Clause Manatt chose language explicitly

---

[8]    The principle of construing ambiguities against the drafting party applies to New York law as well as federal law. <u>Cowen & Co. v. Anderson</u>, 76 N.Y.2d 318, 323, 558 N.E.2d 27, 30, 559 N.Y.S.2d 225, 228 (N.Y. 1990); <u>Croman v. Wacholder</u>, 2 A.D.3d 140, 143, 769 N.Y.S.2d 219, 222 (1st Dep't 2003).

providing that neither Manatt nor an applicant would be bound to arbitrate unless the applicant became employed by Manatt and limited the scope of the arbitration to matters pertaining to the applicant's employment or termination (not denial) of employment,

Manatt should be bound by the language it chose in drafting the Application Arbitration Clause.

**D.    The Plaintiff Did Not Sign Or Assent To The New Terms Proposed By Manatt In The Offer Letter Arbitration Clause.**

**1.    The Offer Letter Arbitration Clause Proposes New Terms Not Included In The Application Arbitration Clause And, If Valid, Would Constitute A Separate Superseding Agreement Requiring Mutual Assent And Consideration.**

The Offer Letter Arbitration Clause that Kirkland never signed states:

In the event that a dispute should arise between us under or in connection with any aspect of this Agreement, including, but not limited to, the performance of or failure to perform any duty or obligation under this Agreement by any Firm partner, employee, or agent, and the validity of this arbitration provision, such dispute shall be resolved by final, binding arbitration in Los Angeles. California in accordance with the Commercial Arbitration rules of the American Arbitration Association ("AAA"). The terms and procedures applicable to any such arbitration and to the selection of the arbitrator are set forth on Annex A, which is incorporated herein by reference.

Kirkland Dec., Exh. 8 at 2.

Attached to the Offer Letter is a two page description of arbitration procedures (the "Arbitration Procedures") which are incorporated by reference into the Offer Letter Arbitration Clause as Annex A. See above and Kirkland Dec., Exh. 8 at 3-4.

The Offer Letter Arbitration Clause and the Arbitration Procedures propose three additional material terms that were not part of the original Application Arbitration Clause that Kirkland signed. First, the Offer Letter Arbitration Clause includes a requirement than any arbitration must take place in Los Angeles, California, which would be a substantial inconvenience and hardship for a paralegal working in Manatt's New York City Office. Kirkland Dec., ¶21 and Exh. 8 at 2.

The second material difference between the two arbitration clauses is Manatt's attempt to deprive the federal courts of jurisdiction over any disputes over the validity of the

16

parties' arbitration agreements by inserting language in the Offer Letter Arbitration Clause that would provide that an arbitrator, not the courts, must decide any challenges regarding the validity of the Offer Letter Arbitration Clause. Kirkland Dec., Exh. 8 at 2. It has long been settled that where an arbitration agreement, such as the agreement contemplated by the Application Arbitration Clause, is silent on the procedure for determining challenges to the arbitration agreement's validity, then the courts, not the arbitrator, have exclusive jurisdiction to determine the existence or validity of an agreement to arbitrate. "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." AT & T Techs. v. Communications Workers of Am., 475 U.S. 643, 649, 89 L. Ed. 2d 648, 656, 106 S. Ct. 1415, 1418 (1986). Accord, John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 53 (2d Cir. 2001). Similarly, under New York law "it is for the courts to determine, in the first instance, whether the parties have entered into a binding agreement to arbitrate." Liberty Management & Constr. v. Fifth Ave. & Sixty-Sixth St. Corp., 208 A.D.2d 73, 79 620 N.Y.S.2d 827, 829-830 (1st Dep't 1995) (citing Sisters of St. John the Baptist, Providence Rest Convent v. Phillips R. Geraghty Constructor, 67 N.Y.2d 997, 998, 494 N.E.2d 102, 103, 502 N.Y.S.2d 997, 999 [1986]).

   The last sentence of the Arbitration Procedures adds a third new requirement: that any decision of the arbitrator, including the amount of any award, must be kept confidential by the parties, a condition that was not part of the original Application Arbitration Clause that Kirkland signed. Kirkland Dec., Exh. 8 at 4.

   While the original Application Arbitration Clause was expressly limited to matters pertaining to Kirkland's "employment with MP&P or the termination of that employment," the language chosen by Manatt for the Offer Letter Arbitration Clause was broader, encompassing "any aspect of this Agreement, including, but not limited to, the performance or failure to perform any duty or obligation under this Agreement by and Firm partner, employee, or agent, and the validity of this arbitration provision, such dispute shall be resolved by final, binding arbitration in Los Angeles, California . . ." [emphasis added]. Cf. Kirkland Dec., Exhs. 6 at 6 and Exh. 8 at 2.

   The consideration recited for the Offer Letter Arbitration Clause is the mutual

17

exchange of promises to arbitrate and Manatt's conditional promise of employment pending the results of a background investigation. Kirkland Dec., Exh. 8 at 1-2. However, the only arbitration clause Kirkland agreed to was expressly conditioned "in consideration of my employment," not a conditional promise of possible future employment. Kirkland Dec., Exh. 6 at 6.

2.    **The Parties Agree That The Offer Letter Arbitration Clause Constitutes A Completely Separate Agreement And Is Not An Amendment Or Clarification Of The Original Application Arbitration Clause.**

Manatt concedes that the Offer Letter Arbitration Clause contemplates an entirely new arbitration agreement and not a mere clarification of the terms of the Application Arbitration Clause signed by Kirkland. Manatt Mem. at 8 ("[i]n sum, there are two equally enforceable arbitration agreements between Plaintiff and MP&P: in the Employment Application and in the Offer Letter"). Also, see generally Manatt Mem. at 7-12. (discussing the two separate arbitration agreements Manatt claims Kirkland agreed to).

3.    **Plaintiff Never Agreed To The New Terms Of The Offer Letter Arbitration Clause And Her Silence Cannot Be Construed As Assent.**

Kirkland never assented to the new agreement contemplated by the Offer Letter Arbitration Clause. In fact, she disagreed with the requirement that arbitration be held in California and she intended to negotiate with Manatt about the new terms. Kirkland Dec, ¶ 21. Kirkland did not sign the Offer Letter nor did she did otherwise indicate her assent to the Offer Letter Arbitration clause. Manatt did not object to her failure to sign the Offer Letter nor did Manatt detrimentally rely on Kirkland's failure to amend the original Application Arbitration Clause.

9 U.S.C. § 2 of the FAA and New York's CPLR § 7501 both require that enforceable arbitration agreements must be written. However, "it is well-established that a party may be bound by an agreement to arbitrate even absent a signature." Genesco, 815 F.2d at 846. Under New York law "[t]here is no requirement that the writing be signed so long as there is other proof that the parties actually agreed on it." [Emphasis added. Citation and internal quotation marks omitted.] Crawford v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 35 N.Y.2d 291, 299, 319 N.E.2d 408, 412, 361 N.Y.S.2d 140, 146 (1974). Accord, Metropolitan Arts & Antiques Pavilion v. Rogers

Marvel Architects, 287 A.D.2d 372, 372, 731 N.Y.S.2d 613 (1st Dept 2001).

However, there is no evidence that Kirkland ever accepted the Offer Letter Arbitration clause.

To determine whether an agreement to arbitrate is valid the Court utilizes "generally accepted principles of contract law." Genesco, 815 F.2d at 845.

Kirkland accepted Manatt's verbal offer of permanent employment and in reliance on Manatt's offer she declined an offer of permanent employment from another law firm that she had previously accepted. Kirkland Dec., ¶ 16. Although the Application Arbitration Clause that Kirkland signed stated that a full copy of Manatt's "Arbitration Agreement" would be sent to her with Manatt's "new hire package," Manatt correctly concedes that the agreement contemplated in the Offer Letter Arbitration Clause constituted a distinct and separate arbitration agreement, not a mere clarification of the Application Arbitration Clause. Manatt Mem. at 7, 8. However, even if the Offer Letter Arbitration Clause could be construed to be an amendment of the Application Arbitration Clause, under New York law an unsigned amendment cannot change the original terms of an agreement without both parties manifesting an express intent to be bound by the new terms. Raam Fabrics, Inc. v. Robert R. Scott Corp., 88 A.D.2d 853, 451 N.Y.S.2d 745, 746 (1st Dept. 1982).

It is also well settled under federal and New York State law that "assent cannot be read into a party's silence in response to another party's assertion unless silence would have a tendency to mislead." World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co., 345 F.3d 154, 173 (2d Cir. 2003). See also, Albrecht Chemical Co. v. Anderson Trading Corp., 298 N.Y. 437, 440, 84 N.E.2d 625, 626 (1949) ("[t]his follows from the settled rule that, where the recipient of an offer is under no duty to speak, silence, when not misleading, may not be translated into acceptance merely because the offer purports to attach that effect to it").

Kirkland's silence did not mislead Manatt. She still wanted to accept Manatt's offer of employment but she wanted to discuss her questions about some of the new terms of the Offer Letter Arbitration Clause with Manatt. Kirkland Dec., ¶ 21. She had every right to do so and she may well have signed the Offer Letter if Manatt told her that the venue of the arbitration clause was

19

not negotiable. However, at the time Manatt unilaterally withdrew its employment offer in reliance on InfoLink's false background report, Kirkland had not agreed to the Offer Letter Arbitration Clause.

Kirkland wanted to work at Manatt, but she also had good reason to want to discuss or renegotiate Manatt's new proposed agreement to require any arbitration to be held in Los Angeles as well as the other changes Manatt proposed from the terms in the Application Arbitration Clause. Manatt's Offer Letter does not offer any consideration for Kirkland's agreement since the Manatt already made its conditional offer of employment that Kirkland previously accepted. Even if the Offer Letter could be construed to offer further consideration to Kirkland, she never indicated her assent to the new terms.

Kirkland received the Offer Letter on or about March 26, 2007, when she had already been working for ALS as a temporary litigation paralegal assigned to Manatt's New York City office for a week. At no time between March 26, 2007 and April 13, 2007, the day Manatt withdrew its offer, did anyone from Manatt object to Kirkland's failure to sign the Offer Letter or tell her that she had to sign the Offer Letter within any specific time frame. Kirkland Dec. ¶ 22. Kirkland reasonably concluded that there was no need for her to sign the Offer Letter while her background check was still pending. Id.

Between April 6 and 13, 2007, Manatt was considering withdrawing its offer to Kirkland. The firm should have realized that there was a good chance that there might be a dispute between Kirkland and Manatt if the offer was withdrawn. However, while Manatt was considering withdrawing Kirkland's offer, no one at Manatt asked Kirkland to sign the Offer Letter agreeing to the new arbitration terms proposed by Manatt.

It appears that Kirkland would have been required to sign the Offer Letter as a condition precedent to becoming a permanent employee of Manatt. However, neither the Offer Letter nor anyone from Manatt ever told Kirkland that she needed to sign the letter by a date certain, nor did Kirkland have any reason to believe that the new terms of arbitration proposed by Manatt were not subject to negotiation or clarification. Accordingly, Manatt cannot now assume that

20

Kirkland ratified an unsigned agreement in the absence of any indication of her assent to the new

terms.

## III.

## THE COURT LACKS JURISDICTION TO COMPEL KROLL TO ARBITRATE BECAUSE KROLL WAS NOT A PARTY TO ANY ARBITRATION AGREEMENT WITH THE PLAINTIFF.

### A. Kroll Cannot Avail Itself Of A Non-Existent Arbitration Agreement Between Kirkland And Manatt.

The gravamen of Kroll's argument that Kroll is eligible for arbitration with Kirkland depends on the validity of a non-existent arbitration agreement between Kirkland and Manatt based on an employment relationship that never existed. The Kroll Mem. erroneously asserts: "[b]ecause Plaintiff's claims against Kroll and Manatt all stem from Plaintiff's application and employment relationship with Manatt, they are factually intertwined. . . . It is undisputed that all of Plaintiff's claims against both Defendants arise directly out of her employment relationship with Manatt." Kroll Mem. at 2, 4. As set forth above, Plaintiff never had an "employment relationship" with Manatt, she was never employed by Manatt. Plaintiff never had a binding arbitration agreement with Manatt because Manatt never gave the consideration promised as a condition for Kirkland's agreement to the Application Arbitration Clause and Kirkland never agreed to the Offer Letter Arbitration Clause. Moreover, the express terms of the Application Arbitration Clause limited arbitrability to claims arising from Kirkland's anticipated employment or the termination of that employment and did not encompass a withdrawal of Manatt's offer of employment.

### B. There Is No Factual Nexus Between Plaintiff's Claims Against Manatt And Her Completely Distinct Claims Against Kroll.

Even if Kirkland had a valid arbitration agreement with Manatt, Kroll was never referred to in either arbitration clause, Kroll never assumed any of Manatt's obligations to Kirkland, Kroll was not Manatt's agent or alter ego, and Kirkland never treated Kroll as such.

Although Manatt and Kroll are both liable for Kirkland's loss of employment and consequent injuries, Kirkland's claims against Kroll and her claims against Manatt are factually and

21

legally distinct. Manatt is liable for negligently and/or maliciously withdrawing its offer of employment in violation of the New York State statutory and common law, as well as violating the procedural requirements of the FCRA pertaining to persons or entities using consumer credit reporting agencies for employment background searches. Kroll d/b/a InfoLink is a consumer credit reporting agency that (i) failed to establish or adhere to procedures required by the FCRA and the NYFCRA for investigating and reinvestigating a subject's criminal background; (ii) defamed Kirkland by falsely reporting that she had been convicted of two misdemeanors and (iii) published false derogatory information about Kirkland to Manatt and other parties through various means including Kroll's electronic on line database which apparently makes criminal background information of persons such as Kirkland available to Kroll's clients who have access to the database. See Cmp. ¶ 28.

The Complaint alleges five causes of action against Manatt and three completely different cause of action against Kroll. Cf. Cmp. ¶¶ 34-47 and ¶¶ 48-62.

**C.    Plaintiff's Defamation Claim Against Kroll Cannot Be Arbitrated Because The Statute Of Limitations Has Expired.**

Manatt's Arbitration Procedures state "[a]ny claim that is not initiated as described in this paragraph within the applicable statute of limitations shall be barred." Kirkland Dec., Exh. 8 at 3.

Kirkland's claim of defamation against Kroll arose on or about April 6, 2007 and would be barred from arbitration by the one year statute of limitations set by CPLR § 215(3).

**D.    Kroll Does Not Meet Any Of The Criteria used By Courts To Compel Arbitration With A Non-Signatory.**

Attempting to escape this Court's jurisdiction, Kroll misconstrues the Second Circuit's holding on the criteria for compelling arbitration with a third party non-signatory to an arbitration agreement. See, Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration International, Inc., 193 F.3d 88, 97-98 (2d Cir. 1999). Citing Smith/Enron, the Kroll Mem. incorrectly asserts that a non-signing party is entitled to arbitration with a signatory if the signatory's claims against the non-signatory are "factually intertwined" with arbitrable claims between the signatory parties. Kroll Mem. at 3.

As set forth in <u>Smith/Enron</u> and the other cases cited by the Kroll Mem, a common factual nexus is a necessary, but not sufficient, condition justifying compelling arbitration of claims against a non-signing party. The <u>Smith/Enron</u> court spelled out the criteria for implying an arbitration agreement as follows:

> In this circuit, we have repeatedly found that non-signatories to an arbitration agreement may nevertheless be bound according to "ordinary principles of contract and agency."[Citations omitted.] These principles include "(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel." [citing <u>Thomson-CSF, S.A. v. American Arbitration Ass'n</u>, 64 F.3d 773, 776 (2d Cir. 1995)].

<u>Smith/Enron</u>, 193 F.3d at 97.

Kroll has not even claimed that any of the five criteria above might apply in this case and there is no evidence to support such a claim.

Neither of the two arbitration clauses incorporates Kroll by reference; Kroll has not claimed to have assumed any obligation or liability to the Plaintiff on behalf of Manatt; Kroll has not claimed to be Manatt's agent; there is no evidence of any common ownership or identity between Kroll or Manatt; and Kroll has not claimed, nor is there any basis for Kroll to claim, that Kirkland is estopped from proceeding against Kroll in a judicial forum.

In <u>Smith/Enron</u> the Court held that "by treating the Enron entities as a single unit in its complaint in the Dominican Lawsuit, SCI is estopped from claiming that the current signatories to the 1994 Agreement are distinct from the defendants in the Dominican Lawsuit." <u>Smith/Enron</u>, 193 F.3d at 98. The "Enron entities" were a group of affiliated companies that admitted they were alter-egos of each other with a common management and common mailing address for correspondence. <u>Smith/Enron</u>, 193 F.3d at 97-98.

The following five cases cited in the Kroll Mem. at 3-4 as examples of instances where courts required arbitration with non-signatories are equally inapposite. For example, <u>Choctaw Generation Limited Partnership v. American Home Assurance Co.</u>, 271 F.3d 403, 405 (2d Cir. 2001) was a surety case where the surety's bond explicitly incorporated by reference the underlying construction contract, including the contract's arbitration clause. The contractor was therefore

23

estopped from denying arbitration on claims that were closely linked to the contractual dispute that was subject to arbitration. Id. See also, Campaniello Imports, Ltd. v. Saporiti Italia S.P.A., 117 F.3d 655, 666 (2d Cir. 1997) (using piercing the corporate veil, alter-ego and agency theories to hold claims against company's owner/manager arbitrable when owner/manager was acting for company that had a binding arbitration agreement.); Roby v. Corporation of Lloyd's, 996 F.2d 1353, 1360 (2d Cir, 1993)  (claims against employees of entities are covered by arbitration agreements made with their employers for acts taken on employer's behalf even if employees have not signed the arbitration agreement); Zaks v. TES Franchising, LLC, 2004 U.S. Dist. LEXIS 12764,*1, *23 (D.Conn. 2004) ("TES Plaintiffs acknowledge that they stated in their complaints that the TES Parties 'have no separate recognizable legal identities for the purposes of this action'"); Scher v. Bear Stearns & Co., 723 F.Supp. 211, 216-217 (S.D.N.Y. 1989)(employee of a brokerage house was a disclosed agent of brokerage and claims against the agent were attributable to principal and, therefore, the claims against the agent were subject to arbitration under agreement between customer and principal).

To summarize, Kroll has not and cannot allege any of the five criteria that are required for a court to take the extraordinary step of requiring Kirkland to arbitrate with a party she has not signed an agreement to arbitrate with. The existence of some common factual issues in Kirkland's claims against Manatt and Kroll is not sufficient to imply an agreement to arbitrate between Kirkland and Kroll.

## IV.

## THE COURT SHOULD DENY MANATT'S MOTION TO DISMISS THE COMPLAINT.

Manatt's notice of motion includes a motion for dismissal under F.R.Civ.P. 12(b)(6). However the Manatt Mem. makes no argument in support of dismissal on the ground of failing to state a claim.

For the purpose of deciding the branch of Manatt's motion seeking dismissal pursuant to Fed. R. Civ. P. 12(b)(6), the Court should accept all well pleaded facts in the complaint

as true and draw all reasonable inferences in favor of the party opposing dismissal. <u>Leatherman v. Tarrant Cty. Narcotics Intel., etc.</u>, 507 U.S. 163, 164 (1993).

As a general rule, when granting a motion to dismiss, the courts of the Second Circuit have favored using their discretion to allow plaintiffs leave to replead unless the court determines that there is no basis pleading a valid cause of action on the facts alleged. <u>Cortec Indus. v. Sum Holding L.P.</u>, 949 F.2d 42, 48 (2d Cir. 1991). Plaintiff respectfully requests that if any part of the Complaint is found to be defective, the Court should dismiss that portion without prejudice and give Plaintiff an opportunity to replead.

## CONCLUSION

For the foregoing reasons, the Court should enter an Order:

(1)    Denying the Motions to Compel Arbitration and Stay this lawsuit by Defendants Manatt and Kroll;

(2)    Denying Manatt's to Dismiss and;

(3)    Granting whatever further relief is appropriate in the interest of justice.

In the event the Court determines that there are factual issues pertaining to the motions that cannot be resolved on submissions, then the Court should schedule an evidentiary hearing on such issues pursuant to 9 U.S.C. § 4.

Dated:  New York New York
        August 22, 2008

Respectfully Submitted,

RONALD B. McGUIRE
Attorney For Plaintiffs
PMB 199-511 Avenue Of The Americas
New York, N.Y.  10011-8436
(201) 795-0342
ronmcguire@att.net

# APPENDIX A

**LexisNexis®** *Total Research System*

Switch Client ┊ Preferences ┊ Sign Out ┊ [?] Help

*My Lexis*™ ╲ Search ╲ Research Tasks ╲ Get a Document ╲ *Shepard's*® ╲ Alerts ╲ Total Litigator ╲ Transactional A

Service: **Get by LEXSEE®**
Citation: **1998 us app lexis 20160**

*1998 U.S. App. LEXIS 20160, \**

BELL ATLANTIC CORPORATION, Plaintiff-Appellant, -v.- CTC COMMUNICATIONS
CORPORATION and COMPUTER TELEPHONE COMPANY, Defendants-Appellees.

98-7163

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

1998 U.S. App. LEXIS 20160

July 2, 1998, Decided

**NOTICE: [\*1]** RULES OF THE SECOND CIRCUIT COURT OF APPEALS MAY LIMIT CITATION
TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT
OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 1998 U.S. App. LEXIS 32028.

**PRIOR HISTORY:** Appeal from the United States District Court for the Southern District of
New York. This cause came on to be heard on the transcript of record from the United States
District Court for the Southern District of New York (Wood, J.), and was argued.

**DISPOSITION:** AFFIRMED.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant corporation challenged a decision by the United
States District Court for the Southern District of New York, which denied its motion to
compel appellee corporations to submit to arbitration in accordance with the terms of an
arbitration agreement. Appellant contended that the trial court improperly applied the
standard rules of contract law to the agreement and that all disputes should have been
resolved in favor of arbitration.

**OVERVIEW:** Appellant corporation brought an action to compel appellee corporations to
submit to arbitration in accordance with an arbitration agreement. The trial court ruled
that arbitration under the agreement was voluntary and denied appellant's motion to
compel arbitration. On review, appellants contended that the trial court improperly applied
standard contract principles to the arbitration agreement and failed to resolve all doubts in
favor of arbitration. The court disagreed, holding that contract principles were correctly
applied. Specifically, the court ruled that, as drafter of the agreement, all ambiguities must
be construed against appellant.

**OUTCOME:** The trial court's decision, to deny appellant corporation's motion to compel
appellee corporations to submit to arbitration, was affirmed. The court held that arbitration
agreements were subject to the general rules of contract law and that ambiguities in
appellant's contract were properly resolved against it, as the agreement's drafter.

**CORE TERMS:** arbitration, arbitration clause, compel arbitration, agreement to arbitrate, arbitrate, drafter, mutual agreement, arbitration agreement', claims asserted, parties agreed, quotation marks omitted, submit to arbitration, arbitrable, ambiguous, ambiguity

**LEXISNEXIS® HEADNOTES**            □ **Hide**

Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview

Contracts Law > Formation > Acceptance > General Overview

*HN1* Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.  More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement

*HN2* Private agreements to arbitrate must be enforced according to their terms. Arbitration is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit.  More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > General Overview

Contracts Law > Contract Interpretation > Ambiguities & Contra Proferentem > General Overview

*HN3* In determining whether or not the parties have agreed to submit to arbitration in the first instance, common law contract principles apply.  More Like This Headnote |
*Shepardize:* Restrict By Headnote

**COUNSEL:** APPEARING FOR APPELLANT: Richard H. Dolan, Esq. (Schlam Stone & Dolan), New York, N.Y.

APPEARING FOR APPELLEES: Rodger D. Young, Esq. (Young & Associates, P.C.), Southfield, MI.

**JUDGES:** PRESENT: Hon. James L. Oakes, Hon. John M. Walker, Jr., Circuit Judges, Hon. Gregory W. Carman, * Chief Judge.

* The Honorable Gregory W. Carman, Chief Judge of the United States Court of International Trade, sitting by designation.

**OPINION**

SUMMARY ORDER

ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of said district court be and it hereby is AFFIRMED.

Plaintiff-appellant Bell Atlantic Corporation ("Bell") **[*2]** appeals from the February 2, 1998, order entered by the district court denying Bell's motion to compel arbitration pursuant to 9 U.S.C. § 4 of all claims asserted by Bell against defendants CTC Communications Corporation and Computer Telephone Company (collectively "CTC") and all claims asserted by CTC against Bell.

The arbitration clause contained in the parties' Agency Agreement reads:

> Upon mutual agreement, any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association, and judgment upon the award may be entered in any Court having jurisdiction thereof.

Bell argues that the "upon mutual agreement" language does not render arbitration voluntary, but simply guaranteed that the arbitration clause would not be enforceable until the parties had signed and exchanged the Agency Agreement. The district court rejected this reading and held that the clause "does not compel arbitration, but rather requires that if the parties agree to arbitrate a dispute, the Rules of the American Arbitration Association will govern the arbitration. **[*3]** " It further held that even if the phrase "upon mutual agreement" was ambiguous, under standard contract principles the clause would nevertheless be construed against Bell as the drafter of the contract.

On appeal, Bell contends that the district court's interpretation of the clause was erroneous because standard contract principles do not apply to arbitration, rather, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 74 L. Ed. 2d 765, 103 S. Ct. 927 (1983), and that "unless it can be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute, the dispute should be submitted to arbitration." *Concourse Village, Inc. ▾ v. Local 32E, Serv. Employees Int'l Union*, 822 F.2d 302, 304 (2d Cir. 1987) (quotation marks omitted). We do not dispute these propositions, which are premised on the strong federal policy favoring arbitration. Nevertheless, we agree with CTC that Bell has conflated two distinct issues, namely, the issue of whether there is an agreement to arbitrate **[*4]** in the first place with the issue of whether a particular dispute falls within the scope of an already-established agreement to arbitrate. *See, e.g., First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S. Ct. 1920, 1924, 131 L. Ed. 2d 985 (1995) (noting that presumption of arbitrability arises only "when the parties have a contract that provides for arbitration of some issues" and "the question [is] '*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement'"); *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 830-31 (2d Cir. 1988) (court must first "determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement" resolving any doubts in favor of arbitration); *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987) (same).

As noted by the district court, *HN1*⬆ "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986) **[*5]** (quotation marks omitted). Moreover, *HN2*⬆ private agreements to arbitrate must be "enforced according to their terms. Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit." *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 103 L. Ed. 2d 488, 109 S. Ct. 1248 (1989). *HN3*⬆ In determining whether or not the parties have agreed to submit to arbitration in the first instance, common law contract principles apply. *First Options*, 115 S. Ct. at 1924 ("When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts"); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996) (same). Thus, assuming for the purposes of this appeal that the arbitration clause is ambiguous, as Bell contends, we agree with the district court that the ambiguity must be construed against Bell as the drafter

of the agreement. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 115 S. Ct. 1212, 1218-19, 131 L. Ed. 2d 76 (1995) **[\*6]**  (applying common-law contract principles to interpret arbitration clause, including principle that ambiguities should be interpreted against the drafter); *PaineWebber*, 81 F.3d at 1199 (same). Accordingly, the arbitration clause must be read as simply establishing the applicable rules in the event that the parties voluntarily agree to submit a dispute to arbitration after it arises. *See Gangemi v. General Elec. Co.*, 532 F.2d 861, 866, 868 (2d Cir. 1976) (noting that "if the parties agreed to submit to arbitration . . . only by consent, courts are powerless, absent such consent, to compel arbitration" and interpreting similar language in an arbitration clause as providing "for only voluntary or permissive arbitration . . . [thus] it was error for the district court to compel arbitration"); *Menorah Home and Hosp. for Aged and Infirm, Inc. v. Local 144*, 573 F. Supp. 908, 912 (E.D.N.Y. 1983) (court no power to compel arbitration if mutual consent is required), *aff'd*, 751 F.2d 370 (2d Cir. 1984) (table decision).

To the extent the cases relied on by Bell point to a different conclusion, they are not binding on this **[\*7]**  circuit. *See Austin v. Owens-Brockway Glass Container, Inc.*, 78 F.3d 875 (4th Cir. 1996); *American Italian Pasta Co. v. Austin Co.*, 914 F.2d 1103 (8th Cir. 1990); *Ceres Marine Terminals, Inc. v. International Longshoremen's Ass'n*, 683 F.2d 242 (7th Cir. 1982).

For the reasons stated above, the order of the district court is AFFIRMED.

Service: **Get by LEXSEE®**
Citation: **1998 us app lexis 20160**
View: Full
Date/Time: Tuesday, August 5, 2008 - 10:29 PM EDT

* Signal Legend:
🔴 - Warning: Negative treatment is indicated
🟧Q - Questioned: Validity questioned by citing refs
🔺 - Caution: Possible negative treatment
➕ - Positive treatment is indicated
🅰 - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

*My Lexis™* | Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Out | Help



About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# APPENDIX B

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 32670    Page 1 of 8

Case 1:08-cv-03371-DAB    Document 36-4    Filed 08/22/2008    Page 2 of 9

**LexisNexis®** *Total Research System*

Service: **Get by LEXSEE®**
Citation: **2008 us dist lexis 32670**

*2008 U.S. Dist. LEXIS 32670, \**

THE MAZZA CONSULTING GROUP, INC, Plaintiff, - against - CANAM STEEL CORPORATION and EASTERN BRIDGE, LLC, Defendants.

08-CV-38 (NGG)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

2008 U.S. Dist. LEXIS 32670

April 21, 2008, Decided
April 21, 2008, Filed

**CORE TERMS:** completion, arbitration, arbitration clause, steel, delivery, arbitrate, compel arbitration, default, non-signatory's, cause of action, arbitration agreement, arbitrability, timing, steel products, deliver, arbitration provision, disputes arising, intertwined, arbitrator, quotation, grievance, binding, arisen, agreed to arbitrate, waived, Federal Arbitration Act FAA, parties agreed, agreement to arbitrate, agreed to submit, subject to arbitration

**COUNSEL:** **[\*1]** For The Mazza Consulting Group, Inc., Plaintiff: Howard B Cohen ✔, LEAD ATTORNEY, The Vincent A. Deiorio Law Firm, Rye Brook, NY.

For Canam Steel Corporation, Defendant: Suzan Arden ▾, Wasserman Grubin & Rogers LLP, New York, NY; William K. Wilburn, Pro Hac Vice, WKWilburn P.C., Bethesda, MD.

**JUDGES:** NICHOLAS G. GARAUFIS ▾, United States District Judge.

**OPINION BY:** NICHOLAS G. GARAUFIS ▾

**OPINION**

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS ▾, United States District Court Judge.

Defendants Canam Steel Corporation ▾ ("Canam") and Eastern Bridge, LLC ▾ ("Eastern Bridge") (collectively, "Defendants") have both filed motions to dismiss the Complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, to stay the case and compel Plaintiff Mazza Construction Group, Inc. ("Mazza" or "Plaintiff") to arbitrate its claims. For the reasons that follow, the court dismisses the Complaint without prejudice and compels Mazza to arbitrate its claims pursuant to the terms set forth in the parties' Completion Agreement.

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 32670          Page 2 of 8

Case 1:08-cv-03371-DAB     Document 36-4     Filed 08/22/2008     Page 3 of 9

## I. Standard of Review

### A. Motion to Dismiss

In reviewing a motion **[*2]** to dismiss for failure to state a claim brought pursuant to Fed R. Civ. P. 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences from those allegations in favor of the non-moving party. See Albright v. Oliver, 510 U.S. 266, 268, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994); Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999). In deciding such a motion, the court may take into account documents referenced in the complaint, as well as documents that are in the plaintiff's possession or that the plaintiff knew of and relied upon in filing the suit. See Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993). In deciding such a motion, the "issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996) (internal quotations omitted).

Where a plaintiff references written documents in the Complaint, the court may take the documents into consideration in ruling on a Rule 12(b)(6) motion even if they are not attached to the Complaint and made a part thereof under Rule 10(c). Sazerac Co., Inc. v. Falk, 861 F. Supp. 253, 257 (S.D.N.Y. 1994) **[*3]** (citing Cortec Indus., Inc. v. Sum Holding L. P., 949 F.2d 42, 47 (2d Cir. 1991); I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir. 1991)). If the documents referenced in the complaint contradict the facts alleged by the plaintiff, the documents control and the court need not accept as true the plaintiff's allegations. See Feick v. Fleener, 653 F.2d 69, 75 & n.4 (2d Cir. 1981).

### B. Motion to Compel Arbitration

In evaluating a motion to compel arbitration brought under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, the court should apply a standard similar to that applicable to a motion for summary judgment. Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003). When such a motion is opposed on the ground that no agreement to arbitrate has been made between the parties, a district court should give the opposing party the benefit of all reasonable doubts and inferences that may arise. Doctor's Assocs., Inc., v. Distajo, 944 F. Supp. 1010, 1014 (D. Conn. 1996), aff'd, 107 F.3d 126 (2d Cir. 1997).

## II. Background

Mazza commenced this action by Complaint dated November 1, 2007. (See Complaint ("Compl.") (Docket Entry # 1).) The Complaint alleges that Defendants **[*4]** breached certain agreements entered into between Mazza and Eastern Bridge concerning a construction project on the Whitestone Expressway. Mazza is a "consortium of experts who assist owners, general contractors, developers, architects and engineers . . . in coordinating and expediting . . . the performance and completion . . . of significant public and private commercial construction projects" in the tri-state area. (Id. P 9.) Eastern Bridge and Canam manufacture, produce, fabricate, and deliver steel and steel-related products for various construction projects. (Id. P 10.)

In the Complaint, Mazza alleges the following facts, which the court assumes to be true for the purposes of this motion to dismiss: (1) On or about January 23, 2003, Eastern Bridge entered into subcontract Purchase Order No. 02-315-23 ("Purchase Order") with general contractor Tully Construction Company/A.J. Pegno Construction Corp. JV ("Tully"), whereby Eastern Bridge was to provide labor and materials for the installation and fabrication of steel at the Whitestone Expressway project in Queens, New York ("Whitestone Project") (id. PP 1, 36); (2) On or about January 30, 2006, Mazza and Eastern Bridge entered into **[*5]** an "Engagement Agreement," ("Engagement Agreement") whereby Mazza was retained "to provide its expertise in gathering information and data for the preparation of a payment

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 32670                    Page 3 of 8

Case 1:08-cv-03371-DAB      Document 36-4      Filed 08/22/2008      Page 4 of 9

claim for the Whitestone Project," (id. P 11), and Mazza was also retained under the Engagement Agreement to provide its expertise and guidance in negotiations and collections concerning the Whitestone Project (id. P 11); and (3) On or about May 15, 2007, Mazza, Eastern Bridge, and Tully entered into a Completion Agreement ("Completion Agreement") whereby Mazza was to perform additional services relating to the Whitestone Project (id. P 36).

The Complaint further alleges: (4) that Eastern Bridge agreed to pay Mazza on an hourly basis for work performed by its experts in preparation of the payment claim (id. P 12); (5) that Eastern Bridge agreed that, in addition to its obligations to pay Mazza for certain services on an hourly basis, Eastern Bridge would pay Mazza a ten-percent "success fee of any and all claim items, finally accepted, and paid as they appear in the Mazza report or claim book" (id. P 12); (6) that Mazza provided the agreed-upon work, labor, and services to Eastern Bridge for the Whitestone Project **[*6]** pursuant to the terms of the January 30, 2006 written agreement, *i.e.* the Engagement Agreement (id. P 13); and (7) that "[d]espite due demand, Eastern has failed, refused and neglected to pay Mazza the outstanding balance in the January 30, 2006 contract" in the sum of $ 238,588.00 plus statutory interest (id. P 14). Specifically citing the Completion Agreement, Mazza further alleges that Eastern Bridge failed to deliver steel and steel-related products in accordance with agreed-upon delivery dates and, as a result, Mazza will not receive "acceleration payments" of $ 236,000. (Id. PP 37-40.)

Mazza commenced this action based upon its agreements with Eastern Bridge. By separate agreement dated July 16, 2007, Canam purchased certain assets of Eastern Bridge, including the Whitestone Project. Canam is not a signatory to the Engagement or Completion Agreements. (Declaration of Suzan Arden, attorney for Canam ("Arden Decl.") Ex. D.)

The Completion Agreement states in pertinent part:

> 11.) *Any disagreement(s) after the date of this agreement, such as but not limited to the production and delivery of steel, delays, defaults, faulting party or the period of extension to be allowed shall be the* **[*7]** *subject of binding arbitration conducted under the rules of the American Arbitration Association, at a location in Hartford, CT after the completion of the project.* Said disagreement(s) shall not be a cause to disrupt the delivery of product, or the payments described in the attached Schedule.

> 12.) No offsets by either party will be allowed under this agreement to interrupt either the payment schedule or the delivery. Any additional charges proposed by either party shall be handled under a separate arrangement so as to prevent any interruption in the work flow or payment stream.

(Completion Agreement; Arden Decl. (emphasis added).) Defendants have submitted motions to dismiss or, in the alternative, to compel arbitration under the terms of the arbitration agreement in the Completion Agreement.

## II. Analysis

### A. Scope of Arbitration Clause

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 3, states:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which suit is pending, upon being satisfied that the issue

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 32670                    Page 4 of 8

Case 1:08-cv-03371-DAB    Document 36-4    Filed 08/22/2008    Page 5 of 9

involved in such suit or proceedings is referable to arbitration **[*8]** under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement provided the applicant for the stay is not in default in proceeding with such arbitration.

In three cases that have come to be known as the Steelworkers Trilogy, **¹** the Supreme Court has made clear that "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960). In Pathmark Stores, Inc. v. United Food & Commercial Workers Local 342-50, this court explained the rule announced in the Steelworkers Trilogy:

> The Supreme Court has extracted four principles from the Steelworkers Trilogy that control the issue of arbitrability now before this court. First, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." [AT&T Technologies, Inc. v. Communications Workers of Am., 475 U.S. 643, 648, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986)].  **[*9]** Second, "the question of arbitrability . . . is undeniably an issue for judicial determination." Id. at 649. Third, "in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims." Id. at 649. And, fourth, . . . "where the contract contains an arbitration clause, there is a presumption of arbitrability . . . . Such a presumption is particularly applicable where the clause is [ ] broad . . . . In such cases, [i]n the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful of evidence of a purpose to exclude the claim from arbitration can prevail." Id.

204 F. Supp. 2d 500, 503 (E.D.N.Y. 2002) (Garaufis, J.). There is a "two-part test for determining arbitrability of claims not involving federal statutes: (1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement." Vera v. Saks & Co., 335 F.3d 109, 117 (2d Cir. 2003) (internal quotations omitted).

**FOOTNOTES**

**¹** United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S. 593, 80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960); United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960);  **[*10]** United Steelworkers of Am. v. Am. Mfg., 363 U.S. 564, 80 S. Ct. 1343, 4 L. Ed. 2d 1403 (1960).

Here, there is no doubt that the parties agreed generally to arbitrate disputes arising from the Completion Agreement. The Completion Agreement states in pertinent part that "[a]ny disagreement(s) after the date of this agreement, such as but not limited to the production and delivery of steel, delays, defaults, faulting party or the period of extension to be allowed shall be the subject of binding arbitration conducted under the rules of the American Arbitration Association, at a location in Hartford, CT after the completion of the project. Said disagreement(s) shall not be a cause to disrupt the delivery of product, or the payments described in the attached Schedule." (Completion Agreement P 11; Arden Decl. (emphasis added).) Thus the parties clearly agreed to arbitrate disputes related to the Completion

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 32670          Page 5 of 8

Case 1:08-cv-03371-DAB     Document 36-4     Filed 08/22/2008     Page 6 of 9

Agreement, and the court must next turn its attention to whether the specific disputes at issue come within the scope of the Completion Agreement.

On this point, Plaintiff argues that the first document, the Engagement Agreement, does not require arbitration. Canam responds: "[a]s a matter of textual accuracy, this is true; **[*11]** the Engagement Agreement itself contains no explicit arbitration provision." ( Canam Steel Corporation ▾'s Reply Memorandum in Further Support of Its Motion to Dismiss or, Alternatively, Stay and Compel Arbitration at 2.) However, while the Engagement Agreement itself contains no explicit arbitration provision, the Completion Agreement, executed only a few months later, broadly contemplates that any disagreements be subjected to arbitration, even disagreements arising under the Engagement Agreement.

The Second Circuit has differentiated between broad and narrow arbitration clauses. See McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co., 858 F.2d 825, 832 (2d Cir. 1988) (internal citations omitted) (holding that "[i]n construing arbitration clauses, courts have at times distinguished between 'broad' clauses that purport to refer all disputes arising out of a contract to arbitration and 'narrow' clauses that limit arbitration to specific types of disputes."). The Second Circuit has previously found that a broad arbitration clause is "presumptively arbitrable." See Collins & Aikman Prod. Co. v. Building Sys., 58 F.3d 16, 20 (2d Cir. 1995) (finding that "[a]ny claim or controversy **[*12]** arising out of or relating to th [e] agreement," is broad, and, thus, presumptively arbitrable). The Second Circuit has found that this presumption "is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that [it] covers the asserted dispute." WorldCrisa Corp. v. Armstrong, 129 F.3d 71, 74 (2d Cir. 1997) (internal quotation omitted) (internal citation omitted).

Here, the clause at issue was drafted broadly in a way that shows that the parties clearly intended that all disputes arising from the Engagement Agreement be arbitrated under the arbitration clause in the Completion Agreement. The precise issues raised by Mazza in the Complaint -- which relate to production and delivery of steel, delays, defaults, and defaulting parties -- are specifically contemplated by the arbitration clause in the Completion Agreement. The references to "defaults," "defaulting party," and "delays" in the Completion Agreement illustrate that point. More specifically, the arbitration clause in the Completion Agreement encompasses "any disagreement(s) . . . such as but not limited to the production or delivery of steel," (Completion Agreement **[*13]** P 11), disagreements that indeed lie at the heart of Plaintiff's Complaint. For example, Plaintiff's seventh cause of action for breach of contract alleges inter alia that "Eastern failed to deliver the steel and related steel products, in accordance with the agreed[-]upon delivery dates, July 23, 2007, and September 24, 2007. As a direct result of Eastern's conduct, Mazza will not receive the agreed[-]upon acceleration payments which total $ 236,000." (Compl. P 38.) The Completion Agreement is dated May 18, 2007, a number of months before the alleged failure to deliver steel and related steel products, and the Completion Agreement's arbitration clause covers the delivery of steel and related steel products. To cite another example, Plaintiff's eighth cause of action for breach of duty of good faith and fair dealing alleges that "Eastern slowed, ceased, terminated and therefore delayed . . . the production of steel and related steel products in breach of the agreed[-]upon Schedule of Delivery and Payment." (Compl. P 44.) That cause of action specifically alleges that Eastern Bridge commenced production on an unrelated Canadian project "[d]espite the unequivocal terms and conditions **[*14]** of the Completion Agreement." (Id. P 45.)

As Defendant Eastern Bridge argues:

> At the time of execution of the Completion Agreement, all of the parties intended to expedite a claims resolution procedure by mandating Arbitration. Moreover the timing of said arbitration to await the completion of the project was clearly intended to permit all parties to address all issues related to the project at one

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 32670          Page 6 of 8

Case 1:08-cv-03371-DAB     Document 36-4     Filed 08/22/2008     Page 7 of 9

time and in one forum. The intent was to have one forum to hear all claims, rather than to litigate each alleged default by any party against the others in a piece-meal manner.

(Memorandum of Law in Support of Motion to Dismiss by Eastern Bridge at 4.) Furthermore, the Completion Agreement contemplates that all claims associated with the Whitestone Project prior to the Completion Agreement (i.e., those arising under the Engagement Agreement) are "fully waived and released." (Completion Agreement P 14 ("The parties agree that all claims of any nature whatsoever which they may have against each other associated with this project which have arisen, or relate to actions or inaction of either party, prior to the date of this agreement are hereby fully waived and released.").) Thus, by signing the [*15] Completion Agreement, Mazza waived any claims that predated the Completion Agreement and its arbitration clause. Plaintiff's vague argument that the arbitration clause in the Completion Agreement does not refer to and encompass the Engagement Agreement thus defies common sense.

The court finds that the Completion Agreement, on its face, covers the dispute at issue and clearly supplements the Engagement Agreement, defining and limiting the Engagement Agreement. See Pitta, 806 F.2d at 422-23. As such, the claims raised by Mazza in the Complaint are subject to arbitration.

## B. Applicability of Clause to Consenting Non-Signatory Defendant

Secondly, as to Defendant Canam, the Second Circuit has construed the FAA to require arbitration where, as in the instant case, a consenting non-signatory defendant seeks arbitration. See JLM Industs., Inc. v. Stolt-Nielsen SA, 387 F.3d 163 (2d Cir. 2004) (holding that the defendants, a group of owners whose corporate subsidiaries had signed arbitration agreements, may compel arbitration even though they had not signed the agreements). The Court of Appeals held that:

Our cases have recognized that under the principles of estoppel, a non-signatory to that agreement [*16] may compel a signatory to that agreement to arbitrate a dispute where a careful review 'of the relationship among the parties, the contracts they signed . . .', and the issues that had arisen' among them discloses that 'the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed. . . . [W]here the merits of an issues between the parties was bound up with a contract binding one party and containing an arbitration clause, the 'tight relatedness of the parties, contracts, and controversies' was sufficient to estop the bound party from avoiding arbitration."

Id. at 177 (citations omitted). The determination of whether a non-signatory's issues are intertwined with the arbitration agreement is fact specific, id. at 178, and here the facts are compelling to make such a finding.

First, Mazza's causes of action arise from the Engagement Agreement and Completion Agreement and the performance of the Whitestone Project. Thus, "the merits of this dispute are 'bound up with' and linked textually to the terms of the contract that included the arbitration clause. (Defendant Canam Steel Corp's Memorandum of Law in Support of Its [*17] Motion to Dismiss or, Alternatively to Stay and Compel Arbitration ("Canam Mem.") at 8.) Second, there is a "tight relatedness of the parties" since Mazza and Eastern Bridge executed the Engagement and Completion Agreements, and Canam acquired Eastern Bridge's contract for the Whitestone Project. (Id.) Finally, Mazza has treated Eastern Bridge and Canam as "a single unit" since Mazza's Complaint alleges that Eastern Bridge and Canam are jointly and severally liable under all nine causes of action. (Id. (citing Compl. PP 1, 15,

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 32670          Page 7 of 8

Case 1:08-cv-03371-DAB     Document 36-4     Filed 08/22/2008     Page 8 of 9

19, 23, 25, 28, 34, 40, 46, and 53).)

Based on the relationship among the parties, the contracts they signed, and the issues that have arisen amongst them, Canam has established that the issues it seeks to resolve in arbitration are intertwined with the agreement that Mazza has signed, namely the Completion Agreement. Accordingly, Mazza must arbitrate its claims against Canam in addition to arbitrating its claims against Eastern Bridge.

## C. Timing of Arbitration

Finally, regarding the timing of the arbitration, Defendants argue that the Completion Agreement calls for arbitration to begin "after the completion of the Project." (See Completion Agreement P 11.) They **[*18]** further argue that this language is unambiguous in requiring that arbitration may occur only after the completion of the Whitestone Project. The Completion Agreement further calls for the arbitration to be "conducted under the rules of the American Arbitration Association," (id.) which permits parties to determine contractually when arbitration may begin. The AAA's Commercial Arbitration and Mediation Procedures provide that "[a]rbitration under an arbitration provision in a contract shall be initiated in the following manner: (I) The initiating party (the "claimant") shall, within the time period, if any, specified in the contract(s), give to the other party (the "respondent") written notice of its intention to arbitrate (the "demand")." (Arden Decl., Exh. J, AAA's Commercial Arbitration and Mediation Procedures (Including Procedures for Large, Complex Commercial Disputes), amended and effective September 1, 2007).) The Second Circuit has held that traditional concepts of contract law support the parties' right to determine when arbitration may begin. Mehler v. Terminix Int'l Co. L.P., 205 F.3d 44, 48 (2d Cir. 2000). As the court held in Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC, 450 F.3d 100, 104 (2d Cir. 2006), **[*19]** "[a]rbitration is entirely a creature of contract. The rules governing arbitration, its location, the law the arbitrators will apply, indeed, even which disputes are subject to arbitration, are determined entirely by an agreement between the parties."

As the parties have agreed to arbitrate this case under the terms of the Completion Agreement, the court defers to the arbitrator to determine the meaning of the arbitration clause's timing provision. If the arbitrator determines that the parties have agreed to arbitrate at the completion of the Whitestone Project, the court sees no reason to order otherwise.

Having made these findings, the court must order that the parties engage in arbitration in accordance with the Completion Agreement. See 9 U.S.C. § 4. Because Mazza and Defendants agreed to arbitration, this court has no jurisdiction to adjudicate any of Mazza's claims against Defendants, and therefore the claims against Defendants are properly dismissed. See, e.g., Olin Corp. v. E.I. Dupont De Nemours and Corp., No. 05-CV-100S (SC), 2006 U.S. Dist. LEXIS 22968, 2006 WL 839415 (W.D.N.Y. March 27, 2006).

## III. Conclusion

For the aforementioned reasons, Defendants' motions to dismiss the Complaint or, in the alternative, **[*20]** to stay the case and compel Mazza to arbitrate its claims are granted to the extent that the court dismisses the Complaint without prejudice and compels Mazza to arbitrate its claims pursuant to the terms set forth in the parties' Completion Agreement. Plaintiff is hereby granted leave to re-file within thirty days after the arbitration is completed if further relief from this court is necessary. See Valdes v. Swift Transp. Co., Inc., 292 F. Supp. 2d 524, 534 (S.D.N.Y. 2003), Mahant v. Lehman Bros., No. 99 Civ. 4421 (MBM); 2000 U.S. Dist. LEXIS 16966, 2000 WL 1738399, at *3 (S.D.N.Y. November 22, 2000). The Clerk of Court is directed to close the case.

SO ORDERED.

Get a Document - by Citation - 2008 U.S. Dist. LEXIS 32670   Page 8 of 8

Case 1:08-cv-03371-DAB  Document 36-4  Filed 08/22/2008  Page 9 of 9

Dated: April 21, 2008

Brooklyn, New York

/s/ Nicholas G. Garaufis

NICHOLAS G. GARAUFIS

United States District Judge

 Service: **Get by LEXSEE®**
Citation: **2008 us dist lexis 32670**
  View: Full
Date/Time: Tuesday, August 5, 2008 - 10:39 PM EDT

 About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# APPENDIX C

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392          Page 1 of 16

Case 1:08-cv-03371-DAB     Document 36-5     Filed 08/22/2008     Page 2 of 17

**LexisNexis®** *Total Research System*

Switch Client ⦙ Preferences ⦙ Sign Out ⦙ [?] Help

*My Lexis™* ▾ Search ▾ Research Tasks ▾ Get a Document ▾ *Shepard's®* ▾ Alerts ▾ Total Litigator ▾ Transactional A

Service: **Get by LEXSEE®**
Citation: **2006 U.S. Dist. LEXIS 52392**

*2006 U.S. Dist. LEXIS 52392, \**

ADOL OWEN-WILLIAMS, Plaintiff, v. BB&T INVESTMENT SERVICES, INC., Defendant.

Civil Action No. 06-0948 (CKK)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

2006 U.S. Dist. LEXIS 52392

July 31, 2006, Decided
July 31, 2006, Filed

**PRIOR HISTORY:** Owen-Williams v. Bb&T Inv. Servs., 2006 U.S. Dist. LEXIS 52400
(D.D.C., July 31, 2006)

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff job applicant filed suit against defendant prospective
employer, alleging that the employer breached its employment contract with the applicant.
The employer moved to compel arbitration under the Federal Arbitration Act (FAA) and to
dismiss or stay proceedings, thereby asking the court to enforce the arbitration clause in
its employment contract with the applicant.

**OVERVIEW:** The applicant signed an employment agreement and a covenants
agreement, but the employer revoked its offer of employment due to some problems with
the applicant's background check. The applicant's primary argument was that the
arbitration clause was not enforceable because it was included in the covenants agreement
and not the employment contract. The court held that the language of the arbitration
clause was mutually binding on both parties because the employer also promised to
resolve any disputes arising out of the agreement in arbitration. The court also held that
the employment agreement was governed by the FAA because the applicant's job related
to interstate commerce, as he would have been overseeing financial and securities
transactions flowing across state lines. Thus, the FAA preempted contradictory Georgia law
governing arbitration agreements. Finally, the employer had not waived its right to enforce
the arbitration clause because the depositions noticed by the employer were directly
related to the resolution of the applicant's request for a temporary restraining order and
did not constitute an attempt by the employer to further the litigation.

**OUTCOME:** The court granted the employer's motion to enforce the arbitration agreement
and dismissed the suit without prejudice.

**CORE TERMS:** arbitration, arbitration agreement, employment contract, arbitration
clause, deposition, compel arbitration, waived, binding contract, arbitrate, binding, right to
enforce, preempted, notice, employment relationship, right to arbitration, preliminary
injunction, inconsistently, arbitrability, enforceable, discovery, right to arbitrate, interstate

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392                Page 2 of 16

Case 1:08-cv-03371-DAB    Document 36-5    Filed 08/22/2008    Page 3 of 17

commerce, termination, litigating, actively, commerce, noticing, preempt, background
check, evidentiary hearings

## LEXISNEXIS® HEADNOTES                                              ⊟ **Hide**

Contracts Law > Consideration > Mutual Obligation
Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
*HN1* Often, consideration for one party's promise to arbitrate is the other party's
promise to do the same.  More Like This Headnote

Contracts Law > Consideration > Mutual Obligation
Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
*HN2* Mutual agreements to arbitrate are independently sufficient forms of
consideration. Under Georgia law, a promise is good consideration for another
promise if there is an absolute mutuality of engagement, so that each party has
the right at once to hold the other to a positive agreement.  More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act >
Stays Pending Arbitration
*HN3* See 9 U.S.C.S. § 3.

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act >
General Overview
*HN4* The Federal Arbitration Act was enacted to overcome courts' refusals to enforce
agreements to arbitrate and to place such agreements upon the same footing as
other contracts.  More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act >
Coverage & Exceptions
Constitutional Law > Supremacy Clause > Federal Preemption
*HN5* The United States Supreme Court has concluded that in creating a substantive
rule applicable in state as well as federal courts, Congress intended to foreclose
state legislative attempts to undercut the enforceability of arbitration agreements.
As such, any conflicting state law would violate the Supremacy Clause and be
preempted by the Federal Arbitration Act.  More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act >
Coverage & Exceptions
Constitutional Law > Supremacy Clause > Federal Preemption
*HN6* Georgia's tendency only to enforce arbitration agreements when they are limited
to narrow issues such as damages conflicts with the Federal Arbitration Act (FAA),
which places no such limitations on the enforceability of arbitration agreements.
Georgia does not enforce broad arbitration agreements because the strong could
oppress the weak, nullifying the law securing the enforcement of contracts that
are usurious, illegal, immoral, or contrary to public policy. However, to hold that
Georgia's policy preference to limit enforcement of arbitration agreements would
lead to precisely the type of forum shopping the United States Supreme Court
concluded Congress would not have intended when it passed the FAA, particularly
given the original purpose of its passage was to combat the reluctance of courts to
enforce arbitration agreements. The FAA is a congressional declaration of a liberal
federal policy favoring arbitration agreements, notwithstanding any state
substantive or procedural polices to the contrary. The effect of the section is to
create a body of federal substantive law of arbitrability, applicable to any

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392      Page 3 of 16

Case 1:08-cv-03371-DAB     Document 36-5     Filed 08/22/2008     Page 4 of 17

arbitration agreement within the coverage of the act. Accordingly, any preference Georgia may have regarding the enforcement of arbitration agreements is preempted by the FAA. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Coverage & Exceptions

Constitutional Law > Supremacy Clause > Federal Preemption

**HN7** When the Federal Arbitration Act (FAA) and governing state law conflict, the FAA, with its strong preference for the enforcement of arbitration agreements, governs. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Coverage & Exceptions

Constitutional Law > Congressional Duties & Powers > Commerce Clause > Interstate Commerce > General Overview

Constitutional Law > Supremacy Clause > Federal Preemption

**HN8** In order for the Federal Arbitration Act (FAA) to preempt Georgia law, the arbitration agreement at issue must be within the scope of the FAA. The FAA states that a written provision in a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction shall be valid, irrevocable, and enforceable, save upon grounds as exist at law or in equity for the revocation of any contract. 9 U.S.C.S. § 2. The United States Supreme Court has clarified the meaning of the phrase "involving commerce," concluding that the word "involving," like "affecting," signals an intent to exercise Congress' commerce power to the full. Accordingly, the FAA will govern any contract that involves "commerce" to the extent constitutionally permitted by the Commerce Clause. Additionally, the Supreme Court has stated that the FAA may govern contracts in the employment context. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Coverage & Exceptions

**HN9** If an agreement involves interstate commerce, the federal law applies to enforce its arbitration provision. More Like This Headnote

Civil Procedure > Judicial Officers > Judges > Discretion

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Orders to Compel Arbitration

**HN10** By its terms, the Federal Arbitration Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed. 9 U.S.C.S. §§ 3, 4. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Waivers

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

**HN11** The right to arbitration, like any other contract right, can be waived. The question of whether there has been waiver in the arbitration agreement context should be analyzed in much the same way as in any other contractual context. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act >

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392    Page 4 of 16

Case 1:08-cv-03371-DAB    Document 36-5    Filed 08/22/2008    Page 5 of 17

verage & Exceptions

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Waivers
Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN12* A party waives his right to arbitrate when he actively participates in a lawsuit or takes other action inconsistent with that right. Additionally, the Federal Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability. As such, questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Waivers
Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN13* Waiving one's right to seek arbitration via acting inconsistently with that right occurs through actively litigating or pursuing discovery of the substantive aspects of a case. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Waivers
Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

*HN14* When a party seeking arbitration has stated that intention in its answer, courts generally hold they have not acted inconsistently with their right to arbitrate the dispute. More Like This Headnote

Civil Procedure > Pleading & Practice > Motion Practice > Time Limitations
Civil Procedure > Pleading & Practice > Pleadings > Answers

*HN15* D.C. Super. Ct. R. Civ. P. 12, similar to the corresponding rule in the Federal Rules of Civil Procedure, is a procedural rule governing the timing of filing certain defenses. D.C. Super. Ct. R. Civ. P. 12(b). More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability

*HN16* Questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Stays Pending Arbitration

*HN17* The Federal Arbitration Act states that, when a district court deems arbitration is appropriate, the court shall stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement. 9 U.S.C.S. § 3. However, when all of a plaintiff's claims must be submitted to arbitration dismissal is appropriate. More Like This Headnote

**COUNSEL:** **[*1]** For ADOL OWEN-WILLIAMS, Plaintiff: Seann Patrick Malloy, SIMMONS & ASSOCIATES, CHARTERED, Bethesda, MD US.

For BB&T INVESTMENTS SERVICES INC, Defendant: Alan Leonard Briggs ✓, SQUIRE, SANDERS & DEMPSEY, Washington, DC.

**JUDGES:** COLLEEN KOLLAR-KOTELLY, United States District Judge.

**OPINION BY:** COLLEEN KOLLAR-KOTELLY

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392

Case 1:08-cv-03371-DAB    Document 36-5    Filed 08/22/2008    Page 6 of 17

Page 5 of 16

## OPINION

**MEMORANDUM OPINION**

Plaintiff Adol Owen-Williams ("Plaintiff") filed this action against Defendant BB&T Investment Services, Inc. ("Defendant" or "BB&T") in Superior Court of the District of Columbia on April 21, 2006, alleging Defendant breached its employment contract with Plaintiff. The case was removed to this Court on May 19, 2006. Presently before the Court is Defendant BB&T Investment Services, Inc.'s Motion to Compel Arbitration and Dismiss or Stay Proceedings ("Defendant's Motion to Compel"), in which Defendant asks the Court to enforce the arbitration clause in its employment contract with Plaintiff. For the reasons set forth below, the Court shall grant Defendant's motion and dismiss without prejudice Plaintiff's present action.

## I. BACKGROUND

In January and February of 2006, Plaintiff was interviewed by phone and in person by one of Defendant's recruiters, **[*2]** T.J. Roccograndi, about a position with BB&T. Compl. at 4. Roccograndi decided he "wished to move forward with [Plaintiff]" and asked Plaintiff to fill out a standard industry background form. Def.'s Reply Mem. of BB&T Investment Services, Inc. in Support of Mot. to Compel Arbitration ("Def.'s Reply"), Ex. 2 (5/8/06 Hr'g Tr.) at 9:4-23; Pl.' Opp'n to Def.'s Mot. to Compel Arbitration and Stay Proceedings ("Pl.'s Opp'n") at 2 n. 2. At this time, Plaintiff told Roccograndi "he had to fill yes out to one of the questions [regarding involvement in prior litigation] because he said that he was involved in a litigation case with his neighbor ...." Def.'s Reply, Ex. 2 (5/8/06 Hr'g Tr.) at 9:24-10:2. Plaintiff went on to explain the nature of that litigation and that "the judge ...totally dismissed it." *Id.* at 10:3-25. Because the incident "had nothing to do with [Plaintiff's] business ethics," Roccograndi was satisfied with Plaintiff's explanation. *Id.* at 11:1-5. Following the interview, Roccograndi had the form faxed to BB&T's Compliance Department in Charlotte, North Carolina, so that a background check of Plaintiff could be conducted. *Id.* at 11:17-12:6. The Compliance **[*3]** Department told Roccograndi, based on Plaintiff's initial description of the incident, they wished to proceed in the hiring process, but that they would need Plaintiff to put that description in writing. *Id.* at 13:17-14:2.

Plaintiff was brought in for his final interview on March 21, 2006, and Plaintiff was offered the position via telephone the following day. *Id.* at 14:13-23, 46:13-23. On March 23, 2006, Defendant sent two documents to Plaintiff via Federal Express. Def.'s Reply, Ex. 3 (3/23/06 letter from Roccograndi to Pl. re: job offer ("Employment Contract")), (Protective Covenants Agreement ("Covenants Agreement")). [1] Roccograndi testified that he sent the letter to Plaintiff communicating the employment offer, accompanied by the Protective Covenants Agreement. Def.'s Reply, Ex. 2 (5/8/06 Hr'g Tr.) at 17:13-18:2. Plaintiff testified that the Covenants Agreement was attached to the Employment Contract. *Id.* at 59:8-14.

### FOOTNOTES

[1] For the sake of clarity, the Court will employ Plaintiff's terms to distinguish between the letter extending Defendant's employment offer to Plaintiff ("Employment Contract") and the document attached to that letter providing the terms of employment ("Covenants Agreement"). However, as will be set forth fully below, the Court does not agree with Plaintiff's view that the Employment Contract alone, and not the Covenants Agreement, is the sole binding contract between Plaintiff and Defendant.

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392          Page 6 of 16

Case 1:08-cv-03371-DAB     Document 36-5     Filed 08/22/2008     Page 7 of 17

 **[\*4]**  The Employment Contract stated that "[a]ll employment offers are contingent upon standard background checks ...," and informed Plaintiff that his employment would begin April 10, 2006. Employment Contract. The Covenants Agreement contained the following arbitration clause:

> The parties agree that any and all disputes, disagreements, claims, or other conflicts regarding, relating to, or arising out of this Agreement, the Parties' employment relationship, any termination thereof, any employment-related act or practice by Employer or its employees, representatives, or agents, any breach of this Agreement, or any alleged breach of this Agreement, shall be subject and submitted to arbitration.

Covenants Agreement at 7. The Covenants Agreement also stated that the law of Georgia would govern the agreement. *Id.* at 6. Plaintiff signed both documents and returned them March 24, 2006, the day he received them. Def.'s Reply, Ex. 2 (5/8/06 Hr'g Tr.) at 47:6-7, 47:24-48:1; Covenants Agreement (signed and dated by Plaintiff 3/24/06).

Roccograndi informed Plaintiff he would need to provide a written record of the incident with his neighbor to ensure Compliance would approve **[\*5]**  Plaintiff's hiring. Def.'s Reply Ex. 2 (5/8/06 Hr'g Tr.) at 18:3-6. Roccograndi received Plaintiff's response to this request on March 28, 2006 and was "disappointed" and "shocked" because the letter communicated what Roccograndi considers "a totally different story from what [he] was initially told by [Plaintiff]" and because Roccograndi "put [his] name on the line" communicating Plaintiff's initial version of the story to the Compliance Department. *Id.* at 18:7-23. Roccograndi passed the letter on to Compliance, and, according to Roccograndi's testimony, various employees did not feel comfortable with proceeding with Plaintiff's hiring based on the contents of the letter. *Id.* at 19:1-20:2. The next day, Roccograndi was apprised of another incident in Plaintiff's past that Plaintiff did not disclose to Defendant. *Id.* at 19:1-20:2. The next day, Roccograndi was apprised of another incident in Plaintiff's past that Plaintiff did not disclose to Defendant. Id. at 20:3-9. While Plaintiff was in college, he was convicted of trespassing, a conviction that he has since had expunged from his record, and the National Association of Security Dealers sent that information to **[\*6]**  Defendant in error. Def.'s Reply, Ex. 1 (4/21/06 Hr'g Tr.) at 22:6-13. While Plaintiff and Defendant dispute the precise reason, BB&T eventually decided to rescind its employment offer based on Plaintiff's background check, and Roccograndi communicated this to Plaintiff on April 6, 2006, prior to the date Plaintiff and Defendant had agreed Plaintiff would begin his employment. Def.'s Reply, Ex. 2 (5/8/06 Hr'g Tr.) at 22:15-24, Ex. 1 (4/21/06 Hr'g Tr.) at 40:13-18. On April 11, 2006, Roccograndi and Plaintiff spoke again, and Roccograndi confirmed that the Compliance Department was not willing to approve Plaintiff for hiring. Def.'s Reply, Ex. 1 (4/18/06 Hr'g Tr.) at 41:22-42:1.

After unsuccessfully pursuing the matter further with Roccograndi, Plaintiff retained counsel in order to file the instant action in Superior Court of the District of Columbia. *Id.* at 54:25-55:9; 56:2-57:4. On April 21, 2006, the day the Complaint was filed, Plaintiff also filed an emergency motion for a temporary restraining order ("TRO") to prevent Defendant from filling Plaintiff's position at BB&T so that "maybe somebody with a reasonable mind [at BB&T] could take an objective look at [Plaintiff's]  **[\*7]**  situation again." Def.'s Reply, Ex. 1 (4/21/06 Hr'g Tr.) at 87:8-15. That same day, the first of two evidentiary hearings on Plaintiff's requested TRO was held, in which Plaintiff sought to show he was entitled to injunctive relief. Def.'s Reply, Ex. 1 (4/21/06 Hr'g Tr.) at 82:25-16; 87:8-15. From the bench, Superior Court Judge Robert S. Tignor denied Plaintiff's motion, *id.* at 102:3-103:13, but three days later, Judge Tignor vacated his denial and issued an order permitting the parties to offer further evidence at an additional hearing, 4/24/06 Order. [2] In preparation for that hearing, Defendant served notices of deposition and document requests on Plaintiff. Pl.'s Opp'n at 3. Defendant never held those depositions, Def.'s Reply at 13, though Plaintiff states he produced documents in response to Defendant's requests, Pl. Opp'n at 3. The second

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392    Page 7 of 16

Case 1:08-cv-03371-DAB    Document 36-5    Filed 08/22/2008    Page 8 of 17

hearing was held on May 8, 2006, and the Superior Court again denied Plaintiff's motion. *See* Def.'s Reply, Ex. B (5/8/06 Hr'g Tr.); 5/8/06 Order.

---

**FOOTNOTES**

2 Plaintiff incorrectly characterizes Judge Tignor's decision on April 21, 2006 as issuing "a temporary injunction preventing BB&T from filing Mr. Owen Williams [sic] position." Pl.'s Opp'n at 3. Instead, a review of the transcript indicates that Judge Tignor temporarily vacated his previous decision denying Plaintiff's requested relief pending further hearing. Ultimately, Judge Tignor denied Plaintiff's requested temporary restraining order for good on May 8, 2006.

---

**[*8]**  The day of the second hearing, Defendant filed its first motion to compel arbitration, which the Superior Court denied because Defendant failed to comply with D.C. Superior Court Rule 12. Pl.'s Opp'n at 7 n. 8. On May 11, 2006, Defendant filed Defendant BB&T Investment Services, Inc.'s Answer and Affirmative Defenses ("Answer"), in which Defendant stated that "this matter should proceed in arbitration," and that in filing the Answer, Defendant did not intend to waive its right to seek enforcement of the arbitration agreement contained in the Covenants Agreement. Answer at 1. On May 19, 2006, the action was removed by Defendant to this Court. *See* Defendant BB&T Investment Services, Inc.'s Notice of Removal. One week later, Defendant filed the motion presently before the Court, Defendant's Motion to Compel, in which Defendant seeks enforcement of the arbitration clause in the Covenants Agreement.

## II. DISCUSSION

Plaintiff argues that Defendant's Motion to Compel should be denied because the arbitration agreement was not supported by consideration and thus was not part of a binding contract; because Georgia law governs the terms of Plaintiff and Defendant's employment agreement, **[*9]**  such that Georgia's policy preference against the enforcement of broad arbitration agreements dictates that the instant arbitration agreement is too broad to be enforced; and because, even if the arbitration agreement were valid and appropriate here, Defendant waived its right to enforce the agreement by acting inconsistently with an intention to arbitrate and actively litigating the action thus far. The Court will address each of Plaintiff's contentions in turn, concluding that the arbitration agreement is a binding contract supported by consideration, that the Federal Arbitration Agreement ("FAA") preempts Georgia law and governs the agreement, and that Defendant has not litigated the merits of this action and thus has not waived its right to enforce the arbitration agreement.

*A. The Covenants Agreement, Including the Arbitration Clause, Is a Binding Contract*

Plaintiff's primary argument is that the arbitration clause is not enforceable because it was included in the Covenants Agreement and not the Employment Contract. Pl.'s Opp'n at 4-5. According to Plaintiff, the Covenants Agreement was signed by Plaintiff subsequent to his entry into the Employment Contract, such that there **[*10]**  was no additional consideration for the provisions of the Covenants Agreement. *Id.* Plaintiff avers that the terms of the Covenants Agreement are "purely one-sided" and thus, the Covenants agreement is not an enforceable contract, making all of its provisions, including the arbitration clause, unenforceable. *Id.* at 5. Plaintiff supports his contention that the Covenants Agreement is not a contract by quoting a provision that appears twice in the document:

> Employment-at-Will. Employee acknowledges and understands that nothing set forth in this agreement creates or is intended to (or is to be construed to) create any employment contract of any specified term between the parties. Rather, the parties agree that employee's employment is considered at will and may be

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392          Page 8 of 16

Case 1:08-cv-03371-DAB     Document 36-5     Filed 08/22/2008     Page 9 of 17

terminated by either employee or employer at any time, for any reason, and with or without notice.

Covenants Agreement at 2; *see also* Covenants Agreement at 8.

It is wholly apparent to the Court that the provision that Plaintiff cites, not once in its entirety, is meant to distinguish between at-will employment, in which either party can terminate the employment relationship at any time, and an **[*11]** employment contract for a specified period of time. While the Court acknowledges Plaintiff's efforts to bring this clause to its attention, including quoting it three times, bolded and underlined, the Court would have appreciated Plaintiff quoting the full provision or including ellipses indicating any omitted material, particularly where, as here, the omitted language is material to the meaning of the sentence. *Compare* Pl.'s Opp'n at 6 n. 7 ("Nothing Set Forth In This Agreement Creates or is Intended to Create Any Employment Contract.") *and* Covenants Agreement at 2 ("Employment-at-Will: Employee acknowledges and understands that nothing set forth in this agreement creates or is intended to (or is to be construed to) create any employment contract of any specified term between the parties."). This provision is clearly not meant to state that the Covenants Agreement was not a binding employment contract, particularly given that the document also states: "for the above-referenced and other good and valuable consideration, the sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties voluntarily agree" to the terms set forth in the Covenants Agreement. **[*12]** *Id.* at 1.

In an attempt to prove the Covenants Agreement was not a binding contract, Plaintiff argues: "[t]he March 23rd, 2006 Employment Contract constituted a binding employment contract with the Defendant. Later, after executing and returning the Employment Contract by mail, Plaintiff was presented with another document called the 'Protective Covenant Agreement.'" Pl.'s Opp'n at 6. As Defendant notes, the facts fail to support Plaintiff's assertion; rather, the Employment Contract and the Covenants Agreement were sent to Plaintiff together on March 23, 2006, received, signed, and returned by Plaintiff the following day. Def.'s Reply at 5, Ex. 2 (5/8/06 Hr'g Tr.) at 17:15-18:2, 59:8-14; Covenants Agreement. Plaintiff's assertion that he received the Covenants Agreement subsequent to his signing and returning the Employment Contract is contrary to his own testimony under oath, as well as the dates borne by both of the documents, which indicate they were returned to Defendant together. *See* Employment Contract (dated March 23, 2006 by Defendant); Covenants Agreement (dated March 24, 2006 by Plaintiff's signature). Plaintiff stated that he "signed and mailed the contract, **[*13]** " which was "multi-page" containing "several other pages attached to" the cover letter. Def.'s Reply, Ex. 1 (4/21/06 Hr'g Tr.) at 16:6-9. Based upon the signed and dated documents and Plaintiff's testimony, the Court concludes that the documents were, indeed, received, signed, and returned together. As such, Plaintiff's attempt to convince the Court that the Covenants Agreement is not a binding contract because it was signed by Plaintiff "later" than the Employment Contract fails because this assertion is contrary to the record before the Court.

Additionally, Plaintiff's attempt to urge the Court that the Covenants Agreement is not a binding contract fails because his assertion that the agreement was one-sided and lacking consideration is without merit. The document states: "this Agreement [is] ancillary to, an integral term and condition of and in consideration for such employment with Employer ...." Covenants Agreement at 4. Many of its terms are explicitly mutual, such as the frequently cited At-Will provision, which states that "employee's employment is considered at will and may be terminated by *either employee or employer* at any time ...." Covenant Agreement at 2 (emphasis **[*14]** added).

Specifically with regard to the mutuality of the arbitration clause, Plaintiff argues that the present case is similar to *Gibson v. Neighborhood Health Clinics, Inc.*, in which the Seventh Circuit held that an arbitration clause in the plaintiff employee's policy manual was not

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392      Page 9 of 16

Case 1:08-cv-03371-DAB    Document 36-5    Filed 08/22/2008    Page 10 of 17

binding on the plaintiff because the agreement lacked consideration. *121 F.3d 1126, 1131 (7th Cir. 1997)*. However, that holding turned on the fact that the agreement was "worded entirely in terms of [the plaintiff's] obligation to submit her claims to arbitration (using phrases such as "I agree" "I understand" "I am waiving"); it contains no promise on [the defendant's] part." *Id.* In fact, the court in *Gibson* explicitly stated, *HN1* "[o]ften, consideration for one party's promise to arbitrate is the other party's promise to do the same," but in that particular agreement, no such return promise from the employer existed. *Id.* (citing *Patterson v. Tenet Healthcare, Inc., 113 F.3d 832, 835 (8th Cir. 1997)*; *Matterhorn, Inc. v. NCR Corp., 763 F.2d 866, 869 (7th Cir. 1985))*.

Unlike in *Gibson*, the language of the arbitration clause in the instant **[*15]** case is mutually binding on both Plaintiff and Defendant. It states:

> The Parties agree that any and all disputes, disagreements, claims, or other conflicts regarding, relating to, or arising out of this Agreement, the Parties' employment relationship, any termination thereof, any employment-related act or practice by Employer or its employees, representatives, or agents, any breach of this Agreement, or any alleged breach of this Agreement, shall be subject and submitted to binding arbitration.

Covenants Agreement at 7. *HN2* "Mutual agreements to arbitrate are independently sufficient forms of consideration." *Sapiro v. VeriSign, 310 F. Supp. 2d 208, 214 (D.D.C. 2004)* (citing *Morrison v. Circuit City Stores, Inc., 317 F.3d 646, 667 (6th Cir. 2003))*. *See also Rushing v. Gold Kist, Inc., 256 Ga. App. 115, 119, 567 S.E. 2d 384 (2002)* ("[U] under Georgia law, a promise is good consideration for another promise if there is an absolute mutuality of engagement, so that each party has the right at once to hold the other to a positive agreement. ...[Defendant cooperative] and its members are equally bound to arbitrate those **[*16]** categories of cases designated by the board, to comply with the same arbitration procedures, and to abide by the results.").

Therefore, Plaintiff's argument that the arbitration agreement, as part of the Covenants Agreement, is not enforceable because it lacks consideration, is without merit. While Plaintiff's own testimony directly contradicts Plaintiff's statements in his Opposition regarding the timing of his receipt of the Employment Contract and Covenants Agreement, even if Plaintiff did not receive the Covenants Agreement until a later date, the arbitration clause was nonetheless supported by consideration. Defendant's mutual and equivalent promise to resolve any disputes arising out of the agreement in arbitration suffices as consideration for Plaintiff's promise to do the same. The Court concludes that the Covenants Agreement, and specifically, the arbitration clause, is a binding and enforceable contract supported by consideration.

*B. The Federal Arbitration Act Governs this Contract*

1. Georgia Law is Preempted by the Federal Arbitration Act

Plaintiff attempts to avoid arbitration by arguing that, even if the Covenants Agreement is a binding contract, according **[*17]** to the Governing Law provision, Georgia law governs all disputes relating to the contract. Pl.'s Opp'n at 8. Plaintiff notes Georgia's tendency to only enforce an arbitration contract if it "limits its applicability to questions such as the amount of loss or damage and requires arbitration as a condition precedent to a right of action upon the contract itself." *Id.* (citing *Freeman v. C.W. Redfern Enter., Inc., 182 Ga. App. 205, 206, 355*

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392          Page 10 of 16

Case 1:08-cv-03371-DAB     Document 36-5     Filed 08/22/2008     Page 11 of 17

S.E.2d 79 (1987) (quoting *Savannah Transit Auth. v. Ledford*, 179 Ga. App. 238, 238, 345 S.E.2d 915 (1986))). [3] The arbitration clause in the Covenants Agreement is broad in that it applies to all aspects of disputes arising out of the employment relationship between Plaintiff and Defendant. *See* Covenants Agreement at 7. According to Plaintiff, the arbitration clause is not "narrowly limited as required by Georgia law. ...[such that] the arbitration clause of the contract should not be enforced and arbitration should not be compelled." Pl.'s Opp'n at 9.

---

**FOOTNOTES**

[3] Notwithstanding the fact that Georgia law is preempted by the FAA, the Court notes that in 1988, one year after *Freeman*, which Plaintiff cites to illustrate Georgia's policy on arbitration, Georgia's "General Assembly extensively revised the statutory provisions governing arbitration .... The stated intention ...was to extend the enforcement of arbitration construction contracts [only, as had formerly been the case] to all contracts in which the parties have agreed to arbitration in writing." *Weyant v. MacIntyre*, 211 Ga. App. 281, 282, 438 S.E.2d 640 (1993) (internal citations omitted). As such, even if Georgia law were not preempted by the FAA, *Freeman* and other pre-1988 Georgia cases would not govern the arbitrability of this action.

---

**[\*18]**  The FAA states:

> HN3 If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement ....

9 U.S.C. § 3. HN4 The FAA was enacted "to overcome courts' refusals to enforce agreements to arbitrate" and to "place such agreements upon the same footing as other contracts." *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995) (internal citations and quotation marks omitted).

In *Southland Corp. v. Keating*, HN5 the Supreme Court concluded that "[i]n creating a substantive rule applicable in state as well as federal courts, Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." 465 U.S. 1, 16, 104 S. Ct. 852, 79 L. Ed. 2d 1 (1984). **[\*19]**  As such, any conflicting state law would violate the Supremacy Clause and be preempted by the FAA. *Id.* at 15-16, 104 S. Ct. 852; *see also Allied-Bruce*, 513 U.S. at 272, 115 S. Ct. 834 (declining to reconsider its decision in *Southland* that the FAA preempts inconsistent state arbitration laws).

The Georgia Court of Appeals has addressed the impact of *Southland* when the party opposing enforcement of the arbitration clause sought to have the Georgia Arbitration Act govern the dispute. The court stated, "we must conclude that 'the state law and policy ...must yield to the paramount federal law.'" *Primerica Fin. Servs., Inc. v. Wise*, 217 Ga. App. 36, 41, 456 S.E.2d 631 (1995) (quoting *CCC Builders v. City Council of Augusta*, 237 Ga. 589, 592, 229 S.E.2d 349 (1976)). While the Georgia Arbitration Act would have rendered the arbitration clause in *Primerica* unenforceable, the FAA preempted Georgia's law and the Court of Appeals affirmed the district court's enforcement of the arbitration clause. *Id.*

Plaintiff's argument in the instant case fails for the same reasons. While Plaintiff argues that the arbitration **[\*20]**  agreement is governed according to HN6 Georgia's tendency only to

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392        Page 11 of 16

Case 1:08-cv-03371-DAB        Document 36-5        Filed 08/22/2008        Page 12 of 17

enforce arbitration agreements when they are limited to narrow issues such as damages, this tendency conflicts with the FAA, which places no such limitations on the enforceability of arbitration agreements. Georgia does not enforce broad arbitration agreements because "the strong could oppress the weak, ... nullify[ing] the law ...secur[ing] the enforcement of contracts [that are] usurious, illegal, immoral, or contrary to public policy, _Freeman_, 182 Ga. App. 205, 355 S. Ed. 2d 79, at 81 (quoting _Parsons v. Ambos_, 121 Ga. 98, 48 S.E. 696 (1904)). However, to hold that Georgia's policy preference to limit enforcement of arbitration agreements would lead to precisely the type of forum shopping the Supreme Court concluded Congress would not have intended when it passed the FAA, particularly given the original purpose of its passage was to combat the reluctance of courts to enforce arbitration agreements. _Southland_, 465 U.S. at 15, 104 S. Ct. 852.

The FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state **[*21]** substantive or procedural polices to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the act." _Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp._, 460 U.S. 1, 24, 103 S. Ct. at 927, 74 L. Ed. 2d 765 (1983). Accordingly, any preference Georgia may have regarding the enforcement of arbitration agreements is preempted by the FAA. _HN7_ When the FAA and governing state law conflict, the FAA, with its strong preference for the enforcement of arbitration agreements, governs.

2. laintiff and Defendant's Arbitration Agreement is within the Scope of the Federal Arbitration Act

_HN8_ In order for the FAA to preempt Georgia law in governing the instant arbitration agreement, the agreement itself must be within the scope of the FAA. The FAA states, "A written provision in . ...a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ...shall be valid, irrevocable, and enforceable, save upon grounds as exist at law or in equity for the revocation of any contract." _9 U.S.C. § 2_ **[*22]** . The Supreme Court has clarified the meaning of the phrase "involving commerce," concluding that "the word 'involving,' like 'affecting,' signals an intent to exercise Congress' commerce power to the full." _Allied-Bruce_, 513 U.S. at 277, 115 S. Ct. 834. Accordingly, the FAA will govern any contract that involves "commerce" to the extent constitutionally permitted by the _Commerce Clause_. Additionally, the Supreme Court has stated that the FAA may govern contracts in the employment context. _Circuit City Stores, Inc. v. Adams_, 532 U.S. 105, 123, 121 S. Ct. 1302, 149 L. Ed. 2d 234 (2001).

It is clear that Plaintiff and Defendant's employment agreement is governed by the FAA. As Defendant argues, "Plaintiff's employment would have required that he negotiate and oversee financial transactions related to securities sales arising in various states and direct funds flowing across state lines." Def.'s Mot. to Compel at 6. Plaintiff does not rebut this characterization of his employment, nor does he dispute Defendant's assertion that his employment would have involved interstate commerce. _See generally_ Pl.'s Opp'n. Accordingly, the Court concludes that Plaintiff **[*23]** and Defendant's employment contract involved interstate commerce within the meaning of the FAA and therefore, the FAA preempts Georgia law governing arbitration agreements. _See Columbus Anesthesia Group, P.C. v. Kutzner_, 218 Ga. App. 51, 52, 459 S.E.2d 422 (1995) (acknowledging _HN9_ "[i]f the agreement involves interstate commerce, the federal law applies to enforce its arbitration provision") (citing _Southland_, 465 U.S. 1, 104 S. Ct. 852, 79 L. Ed. 2d 1).

_HN10_ "By its terms, the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts _shall_ direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." _Dean Witter Reynolds, Inc. v._

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392     Page 12 of 16

Case 1:08-cv-03371-DAB     Document 36-5     Filed 08/22/2008     Page 13 of 17

*Byrd,* 470 U.S. 213, 218, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985) (emphasis in original) (citing 9 U.S.C. §§ 3, 4). Plaintiff and Defendant's arbitration agreement is clearly within the statute: there is a written arbitration provision in the Covenants Agreement, which the court has already determined is a binding contract supported by consideration, and that contract **[*24]** involves interstate commerce. Accordingly, the Court must direct the parties to arbitration.

### C. Defendant Has Not Waived its Right to Enforce the Arbitration Clause

Plaintiff's final argument against compelling arbitration is that, even if the arbitration agreement is part of a binding contract and governed by the FAA, Defendant has waived its right to enforce that provision by actively litigating the case since its inception. Pl.'s Opp'n at 7. **HN17** "The right to arbitration, like any other contract right, can be waived." *Cornell & Co. v. Barber & Ross Co.,* 123 U.S. App. D.C. 378, 360 F.2d 512, 513 (D.C. Cir. 1966). "[T]he question of whether there has been waiver in the arbitration agreement context should be analyzed in much the same way as in any other contractual context." *Nat'l Found. for Cancer Research v. A.G. Edwards & Sons, Inc.,* 261 U.S. App. D.C. 284, 821 F.2d 772, 774 (D.C. Cir.).

**HN17** "A party waives his right to arbitrate when he actively participates in a lawsuit or takes other action inconsistent with that right." *Cornell,* 360 F.2d at 513; *see also McCormick-Morgan, Inc. v. Whitehead Elec. Co.,* 179 Ga. App. 10, 12, 345 S.E.2d 53 (1986) **[*25]** ("An agreement to arbitrate is waived by any action of a party which is inconsistent with the right of arbitration."). Additionally, "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Cone,* 460 U.S. at 24-25, 103 S. Ct. 927. As such, "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Id.*

Plaintiff avers that Defendant waived its right to enforce the arbitration because it "waited over one month to seek to enforce the arbitration clause ....[T]he parties have participated in two full-blown evidentiary hearings, under oath; extensive discovery including: serving document requests on plaintiff to which Plaintiff responded; serving a subpoena upon, and noticing the Deposition of [Plaintiff's former neighbor]; noticing the Deposition of [Plaintiff]; serving a subpoena upon, and noticing the Deposition of [Plaintiff's former employer]; **[*26]** and filing an Answer." Pl.'s Opp'n at 7. Plaintiff also notes that Defendant's initial motion to compel arbitration, filed on May 8, 2006 in Superior Court prior to the action's removal to this Court, was denied, and that Defendant subsequently "continued to subpoena witnesses for depositions after this date. As such, the effective date that Defendants attempted to invoke the arbitration clause is May 26, 2006," the date Defendant's current motion was filed with this Court. *Id.* at 7 n. 8.

As Defendant correctly notes, the "full-blown evidentiary hearings" were regarding Plaintiff's motion seeking the Superior Court to enjoin Defendant from filling Plaintiff's position while Plaintiff continued to seek reinstatement of his employment contract. Def.'s Reply at 11-12, Ex. 1 (4/21/06 Tr.) at 85:19-86:14. In fact, Plaintiff's Complaint and request for TRO were filed on April 21, 2006, and the first hearing regarding the TRO was held that same day. Def.'s Reply at 11-12. The second evidentiary hearing was held May 8, 2006, when the Superior Court asked to hear further argument on Plaintiff's request for TRO. *Id.,* Ex. 2 (5/8/06 Hr'g Tr.); 4/24/06 Order. Defendant **[*27]** states that each notice of deposition "was in defense of those very same emergency hearings. [Defendant] cancelled all three depositions when it became apparent the depositions could not take place prior to the May 8 hearing on the TRO." Def.'s Reply at 13.

Defendant argues that this Court should follow *Popovich v. McDonald's Corp.,* where the

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392          Page 13 of 16

Case 1:08-cv-03371-DAB     Document 36-5     Filed 08/22/2008     Page 14 of 17

court concluded the defendant "did not waive its right to arbitrate by opposing [the plaintiff's] motion for a preliminary injunction." 189 F. Supp. 2d 772, 775 (N.D. Ill. 2002). There, the plaintiff filed his motion for preliminary injunction one week after filing suit, the court denied the motion two weeks later, and a month after that denial, the defendant filed its motion to compel arbitration. Id. at 774. The court acknowledged that the defendant could have sought enforcement of the arbitration clause during the preliminary injunction proceedings, but "a demand for arbitration would not have precluded the Court from considering the preliminary injunction motion. Even when a claim filed in court is subject to arbitration, a court retains the authority to enter a preliminary injunction to preserve the **[*28]** *status quo ante* and prevent irreparable harm pending a decision by the arbitration panel. ...Thus, [defendant's] opposition to [plaintiff's] motion was in no way inconsistent with the right to arbitrate and does not constitute a waiver." Id. at 775-76 (internal citations omitted).

*Popovich* is consistent with the widely held view that HN13 waiving one's right to seek arbitration via acting inconsistently with that right occurs through actively litigating or pursuing discovery of the substantive aspects of a case. *See, e.g.,* A.G. Edwards, 821 F.2d at 776 (finding that the defendant "chose to have the substance of [plaintiff's] arbitrable claims decided by a court. This election was wholly inconsistent with an intent to arbitrate and constituted an abandonment of a right to seek arbitration."). The court in *A.G. Edwards* explained that to let the defendant arbitrate substantive issues that had already been litigated before the court would violate the "policy that arbitration may not be used as a strategy to manipulate the legal process." *Id.* There, the party seeking arbitration had engaged in discovery, noticing and taking depositions, **[*29]** and requesting and receiving documents. Id. at 775. Similarly, in *Burnham v. Cooney*, the Georgia Court of Appeals affirmed the trial court's finding that the defendant had waived his right to arbitration when he "pled to the merits of the case, responded to discovery, and obtained a transfer of the case ...." 265 Ga. App. 246, 247, 593 S.E.2d 701 (2004). Unlike here, in A.G. Edwards and *Burnham*, those depositions were directed at the substantive issues of each case. *Id.*

In the instant case, no depositions were actually taken, and those noticed were directly related to the resolution of Plaintiff's request for a TRO. Def.'s Reply at 13. The fact that those depositions were only noticed for the purposes of the TRO hearing and not to begin litigating the merits of the case is substantiated by Defendant cancelling those depositions "when it became apparent the depositions could not take place prior to the May 8 hearing on the TRO." [4] Def.'s Reply at 13. Regarding the documents Defendant requested and received from Plaintiff, the timing of the proceedings suggests those documents were exchanged in anticipation of the TRO hearing. Requesting documents in **[*30]** an attempt to defend itself from a TRO should not be viewed as an abdication of Defendant's right to seek enforcement of the arbitration agreement. Defendant stated its intention to enforce the arbitration agreement less than one month after receiving Plaintiff's Complaint, first in its May 8, 2006 Motion to Compel Arbitration and Stay Proceedings, and then again in its May 11, 2006 Answer. When Defendant first stated that intention, the hearings regarding Plaintiff's request for TRO were still ongoing.

---

**FOOTNOTES**

[4] Plaintiff alleges that "Defendant continued to subpoena witnesses for deposition after" its initial motion to compel arbitration was filed and denied. Pl.'s Opp'n at 7 n. 8. Accordingly, Plaintiff contends that the Court should conclude "the effective date that Defendants attempted to invoke the arbitration clause is May 26, 2006," the day Defendant filed its instant Motion to Compel, because up until that date, Defendant was acting inconsistently with its arbitrate. *Id.* However, the Superior Court's docket contains no notices of deposition after Defendant's May 8, 2006 motion seeking enforcement of the arbitration agreement, and the only notices of deposition were filed on April 26, 2006.

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392    Page 14 of 16

Case 1:08-cv-03371-DAB    Document 36-5    Filed 08/22/2008    Page 15 of 17

As such, the Court cannot agree with Plaintiff's statement regarding the "effective date" on which Defendant sought to enforce the arbitration agreement.

**[\*31]** Additionally, *HN14* when a party seeking arbitration has stated that intention in its answer, courts generally hold they have not acted inconsistently with their right to arbitrate the dispute. *See, e.g., Freeman, 182 Ga. App. at 206,* 355 S. Ed. 2d 79 ("[Defendant] raised arbitration as a defense when it filed its answer ....[T]here is no evidence that it took any action inconsistent with its assertion that arbitration was the proper disposition of the controversy."); *Weyant, 211 Ga. App. at 283-84, 438 S.Ed.2d 640* (affirming the trial court's decision to compel arbitration where the defendant "asserted the arbitration clause in his answer and promptly moved to compel arbitration ....").

Plaintiff argues that the "effective date that Defendants attempted to invoke the arbitration clause is May 26, 2006," the date Defendant filed its Motion to Compel with this Court because, prior to removal, Superior Court denied Defendant's May 8, 2006 motion seeking enforcement of the arbitration clause pursuant to the Superior Court Rules of Civil Procedure, Rule 12. Pl.'s Opp'n at 7 n. 8. *HN15* Rule 12, similar to the corresponding rule in the Federal Rules of **[\*32]** Civil Procedure, is a procedural rule governing the timing of filing certain defenses. D.C. Sup. Ct. R. 12(b). The Superior Court's denial of Defendant's motion was procedural and did not reflect a judgment on the merits of Defendant's right to seek arbitration. In fact, the Court notes that the *sua sponte* denial occurred before Plaintiff even filed an opposition to Defendant's motion. Additionally, prior to the May 26, 2006 filing of its Motion to Compel, Defendant asserted its right to arbitration on May 11, 2006, in its Answer listing arbitration as one of its defenses. Answer at 7-8.

Because the standard governing waiver is that the party seeking to enforce the arbitration clause has acted inconsistently with an intention to arbitrate, the Court must conclude that Defendant has not waived its rights, particularly given the Supreme Court's urging that *HN16* "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Cone, 460 U.S. at 24-25, 103 S. Ct. 927.* Defendant's initial procedural error in filing its arbitration defense prior to filing its Answer does not detract from Defendant's express intention to assert **[\*33]** its right to arbitration less than one month after Plaintiff served its Complaint. Taken together, the history of this litigation results in the necessary conclusion that Defendant has not waived its right to enforce the arbitration agreement. Defendant has acted consistently with its intention to pursue enforcement of the clause. Defendant initially responded to Plaintiff's emergency TRO motion, has not engaged in litigation as to the merits of this case, and stated its intention to pursue arbitration less than one month into this action in Defendant's Answer, expressly noting that in answering Plaintiff's Complaint, Defendant was not waiving its right to arbitration. Answer at 1, 7-8. Accordingly, Plaintiff's argument that Defendant waived its right to enforce the arbitration agreement fails, and this Court will compel arbitration.

*D. Dismissal is Appropriate Because all of the Issues Will Be Arbitrated*

*HN17* The FAA states that, when a district court deems arbitration is appropriate, the court shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement ...." *9 U.S.C. § 3.* However, when "all of plaintiff's **[\*34]** claims must be submitted to arbitration" dismissal is appropriate. *Nelson v. Insignia/ESG, Inc., 215 F. Supp. 2d 143, 158 (D.D.C. 2002); see also Alford v. Dean Witter Reynolds, Inc., 975 F.2d 1161, 1164 (5th Cir. 1992)* ("[t]he weight of the authority clearly supports dismissals of the case when all of the issues raised in the district court must be submitted to arbitration").

Plaintiff and Defendant's arbitration agreement states:

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392          Page 15 of 16

Case 1:08-cv-03371-DAB     Document 36-5     Filed 08/22/2008     Page 16 of 17

> The Parties agree that any and all disputes, disagreements, claims, or other conflicts regarding, relating to, or arising out of this Agreement, the Parties' employment relationship, any termination thereof, any employment-related act or practice by Employer or its employees, representatives, or agents, any breach of this Agreement, or any alleged breach of this Agreement, shall be subject and submitted to binding arbitration.

Covenants Agreement at 7. Plaintiff's Complaint alleges breach of contract and detrimental reliance, seeking relief either through Defendant re-hiring Plaintiff or, in the alternative, damages being awarded to Plaintiff to compensate for his detrimental reliance. Compl. at 8-9, 11. **[*35]** The thrust of Plaintiff's action is that Defendant breached a binding employment contract by terminating Plaintiff's employment. *Id.* Defendant, on the other hand, avers that the employment agreement was expressly contingent upon background checks, such that Defendant was not in breach when it decided it did not want to hire Plaintiff upon discoveries Defendant made about Plaintiff's past, or, in the alternative, that Defendant did not breach the contract because Plaintiff's employment was at-will. Answer at 5-7.

Given the breadth of the arbitration agreement and the fact that Plaintiff and Defendant's dispute falls squarely within the language of the agreement, referring to termination and breach, it is apparent that all of the issues in this action are subject to arbitration. As such, the appropriate remedy is dismissal of Plaintiff's action.

## III. CONCLUSION

For the reasons set forth above in this Memorandum Opinion, the Court shall grant Defendant's motion to enforce the arbitration agreement and dismiss this action without prejudice. An appropriate Order accompanies this Memorandum Opinion.

Date: July 31, 2006

/s/ COLLEEN KOLLAR-KOTELLY

United States District **[*36]** Judge

Service: **Get by LEXSEE®**
Citation: **2006 U.S. Dist. LEXIS 52392**
View: Full
Date/Time: Tuesday, August 5, 2008 - 10:42 PM EDT

\* Signal Legend:

🔴 - Warning: Negative treatment is indicated

Q - Questioned: Validity questioned by citing refs

⚠️ - Caution: Possible negative treatment

➕ - Positive treatment is indicated

A - Citing Refs. With Analysis Available

i - Citation information available

\* Click on any *Shepard's* signal to *Shepardize®* that case.

*My Lexis™* | Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Out | Help

https://web.lexis-nexis.com/research/retrieve?_m=3d6f1f0483a94a4058c819ddaf005750&c...     8/5/2008

Get a Document - by Citation - 2006 U.S. Dist. LEXIS 52392          Page 16 of 16

Case 1:08-cv-03371-DAB          Document 36-5          Filed 08/22/2008          Page 17 of 17



About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# APPENDIX D

Get a Document - by Citation - 1989 U.S. Dist. LEXIS 7317    Page 1 of 5

Case 1:08-cv-03371-DAB    Document 36-6    Filed 08/22/2008    Page 2 of 6



Switch Client ┊ Preferences ┊ Sign Out ┊ ? ┊ Help

*My Lexis*™ ▼ Search ▼ Research Tasks ▼ Get a Document ▼ *Shepard's*® ▼ Alerts ▼ Total Litigator ▼ Transactional A

Service: **Get by LEXSEE®**
Citation: **1989 us dist lexis 7317**

*1989 U.S. Dist. LEXIS 7317, \**

JOHN ROLLER, Plaintiff, v. CENTRONICS CORPORATION, Defendant

No. 87 Civ. 5715 (JFK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1989 U.S. Dist. LEXIS 7317

June 22, 1989, Decided

## CASE SUMMARY

**PROCEDURAL POSTURE:** With regard to plaintiff former employee's claims for breach of an employment agreement and promissory estoppel in his diversity action against defendant employer, the employer filed a motion pursuant to 9 U.S.C.S. §§ 3 and 4 to stay the action and compel arbitration.

**OVERVIEW:** The employer offered the employee a vice-president position. The employee received a copy of the employer's standard employment agreement with a letter from the employer. In a subsequent letter, the employee received an outline of the employer's offer to him. The employee never signed the standard agreement, but he signed and returned the outline. The standard agreement set out benefits accorded to executives and contained an arbitration clause. Arguing that he was terminated without cause, the employee sought enforcement of the severance benefits set out in the standard agreement. The employer argued that if the employee was entitled to the severance benefits set out in the standard agreement, then he also was bound by the arbitration provision therein. The employee argued that he could be bound by certain provisions in the unsigned standard agreement but not by others. The court rejected the employee's contention as contrary to fairness and common sense. The employee had unequivocally recognized his intent to be bound by the standard agreement by suing thereunder, and the dispute over whether he had been terminated with cause was plainly arbitrable under the standard agreement.

**OUTCOME:** The court granted the employer's motion as to both claims.

**CORE TERMS:** arbitration, compel arbitration, arbitration clause, severance, employment agreement, arbitration agreement, terminated, vice-president, outline, agreement to arbitrate, arbitrate, concede, letter dated, good cause, arbitrators

## LEXISNEXIS® HEADNOTES                                     ⊟ **Hide**
Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act >
General Overview

Get a Document - by Citation - 1989 U.S. Dist. LEXIS 7317        Page 2 of 5

Case 1:08-cv-03371-DAB      Document 36-6      Filed 08/22/2008      Page 3 of 6

International Trade Law > Dispute Resolution > Arbitration

HN1 See 9 U.S.C.S. § 3.

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > General Overview

International Trade Law > Dispute Resolution > Arbitration

HN2 An Act (federal) states that upon refusal or failure of a party to arbitrate, the court may make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. 9 U.S.C.S. § 4. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability

Civil Procedure > Alternative Dispute Resolution > Mandatory ADR

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

HN3 A motion to compel arbitration requires (1) determining whether an agreement to arbitrate exists; (2) whether an arbitrable claim is at issue and (3) whether there has been a waiver of the right to arbitration. 9 U.S.C.S. § 3. The party seeking to compel arbitration bears the burden of showing that the arbitration agreement exists and a stay is warranted. This burden may be satisfied by the actual production of the arbitration agreement or by showing it was a regular practice of defendant to enter into these agreements. Fed. R. Evid. 406. When the party seeking to compel arbitration meets the initial requirement, the burden of proof shifts to the plaintiff to show a "substantial issue" concerning the presence of an agreement to arbitrate. More Like This Headnote | Shepardize: Restrict By Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > General Overview

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Waivers

Civil Procedure > Alternative Dispute Resolution > Mandatory ADR

HN4 A delay in seeking arbitration does not constitute waiver of the right of arbitration, absent a showing of substantial prejudice by the party alleging waiver. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview

Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement

HN5 A written provision is the indispensable requisite of an enforceable arbitration agreement. A party need not sign an arbitration agreement to be bound if he commits himself to it by actions or conduct. Because arbitration clauses are governed by ordinary contract principles, numerous kinds of conduct may evince an intent to be bound by the arbitration clause. For example, a party may seek to enforce rights derived from other provisions of the agreement and thereby concede an intent to be bound by the entire agreement. More Like This Headnote

Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

Contracts Law > Breach > Causes of Action > General Overview

HN6 While the Federal Rules of Civil Procedure countenance inconsistent and alternative pleading, Fed. R. Civ. P. 8(e)(2), they surely do not sanction the adoption of some terms of an agreement a party seeks to enforce and the jettison of others. More Like This Headnote

**COUNSEL:** [*1] For Plaintiff: Golenbock, Eiseman, Assor, Bell & Perlmutter, New York, New

Get a Document - by Citation - 1989 U.S. Dist. LEXIS 7317                    Page 3 of 5

Case 1:08-cv-03371-DAB     Document 36-6     Filed 08/22/2008     Page 4 of 6

York, Of counsel: Jeffrey T. Golenbock, Esq.

For Defendant: John R. Bartels, Jr. Esq., White Plains, New York.

**OPINION BY:** KEENAN

**OPINION**


OPINION and ORDER

JOHN F. KEENAN, UNITED STATES DISTRICT JUDGE

*BACKGROUND*

*Counts I and III of the complaint in this diversity action allege breach of an employment agreement and promissory estoppel, respectively. This Court previously dismissed Count II of the complaint pursuant to FRCP 12(b)(6). Defendant now moves pursuant to Title 9 U.S.C. §§ 3 and 4 to stay this action and compel arbitration of the claims raised in Counts I and III of the complaint. For the reasons stated below, defendant's motion is granted.*

*STATEMENT OF FACTS*

*Defendant Centronics is a Delaware corporation with its principal place of business in Nashua, New Hampshire. In 1986, defendant sought to establish a presence in New York. To this end, defendant offered the plaintiff, John Roller, the position of vice-president of Corporate Development, requiring that he work in New York. At that time, plaintiff resided and worked in Houston, Texas.*

*Plaintiff alleges that during negotiations with Centronics, he was* **[\*2]** *offered the position of vice-president in accordance with the provisions of the standard Centronics employment agreement for vice-presidents (the "Standard Agreement"). Centronics' Standard Agreement set out benefits accorded to executives, as well as an arbitration clause and a non-competition clause. The benefits included, among other things, health insurance, a company car, and severance benefits. Plaintiff received a copy of the Standard Agreement with a letter dated July 9, 1986. The letter indicated that a detailed offer of employment would follow, and did not request Mr. Roller to sign or return the enclosed Standard Agreement. In a letter dated August 15, 1986, plaintiff received an "outline" of Centronics' offer to him and benefits he would receive. The letter also indicated that Mr. Roller was to accept the "offer" no later than August 25, 1986. Plaintiff signed the outline, accepting the "offer," and returned it by the required date. The outline made no reference to severance benefits or the arbitration clause. Plaintiff commenced working at Centronics on September 1, 1986.*

*On July 2, 1987, Centronics closed its New York office and terminated plaintiff's position. Plaintiff* **[\*3]** *commenced this action August, 1987, alleging a breach of his employment agreement. Plaintiff contends he was terminated without cause and now seeks enforcement of the severance benefits provided for in the Standard Agreement. Centronics argues that no written employment agreement binding Mr. Roller and Centronics ever existed because Mr. Roller never signed the Standard Agreement, but concedes its existence for purposes of this motion. Additionally, Centronics maintains that Mr. Roller was terminated with good cause.*

*The Standard Agreement, which plaintiff asserts is the source of his right to severance benefits, provides that:*

*"Any disputes arising as to whether a termination of executive's employment was with good*

Get a Document - by Citation - 1989 U.S. Dist. LEXIS 7317          Page 4 of 5

Case 1:08-cv-03371-DAB     Document 36-6     Filed 08/22/2008     Page 5 of 6

*cause will be settled by the final decision of a panel of arbitrators to be selected under the rules of the American Arbitration Association."*

*(Stein Aff., Ex. "A" at para. 7). Defendant contends that if plaintiff is entitled to the benefits which are set out in the Standard Agreement, namely the severance benefits, then he must also be bound by the provision providing for arbitration. On the contrary, plaintiff urges that he can be bound by certain provisions in an* **[*4]** *unsigned document, and not by others.*

*DISCUSSION*

9 U.S.C. § 3 *provides in relevant part that:*

HN1 *"In any suit . . . brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court shall stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."*

9 U.S.C. § 3. *In addition,* HN2 *the Act states that upon refusal or failure of a party to arbitrate, the Court may make an "order directing the parties to proceed to arbitration in accordance with the terms of the agreement."* 9 U.S.C. § 4.

HN3 *A motion to compel arbitration requires (1) determining whether an agreement to arbitrate exists; (2) whether an arbitrable claim is at issue and (3) whether there has been a waiver of the right to arbitration.* 9 U.S.C. § 3. *The party seeking to compel arbitration bears the burden of showing that the arbitration agreement exists and a stay is warranted.* Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Company, Inc., 339 F.2d 440, 442 (2d Cir. 1964); Penalver v. Compagnie de Navigation Frutiere, Matouba, 428 F. Supp. 1070, 1072 (E.D.N.Y. 1977). **[*5]** *This burden may be satisfied by the actual production of the arbitration agreement or by showing it was a regular practice of defendant to enter into these agreements.* Fed. R. Evid. 406. *When the party seeking to compel arbitration meets the initial requirement, the burden of proof shifts to the plaintiff to show a "substantial issue" concerning the presence of an agreement to arbitrate.* Almacenes v. Fernandez, S.A. v. Golodetz, 148 F.2d 625, 628 (2d Cir. 1945).

*The Standard Agreement is the contract consistently used by Centronics for all vice presidents of the company. Additionally, it is undisputed that the Standard Agreement contains an arbitration clause and that plaintiff received a copy. Because the arbitration clause specifically applies to disputes concerning whether an executive was terminated with cause, the claims here are plainly ]rbitrable under the Standard Agreement.*

*Although Centronics has waited over one year to move to compel arbitration, it has not waived its right to arbitrate.* HN4 *A delay in seeking arbitration does not constitute waiver of the right of arbitration, absent a showing of substantial prejudice to the party alleging waiver.* Brener v. Becker Paribas, **[*6]** Inc., 628 F. Supp. 442, 451-52 (S.D.N.Y. 1985). Plaintiff has not suggested any harm resulted from the delay.

*The dispute here concerns whether the Standard Agreement's arbitration clause bound the parties. It is axiomatic that* HN5 *a written provision is the sine qua non of an enforceable arbitration agreement.* Fisser v. International Bank, 282 F.2d 231, 233 (2d Cir. 1960). A party need not sign an arbitration agreement to be bound if he commits himself to it by actions or conduct. American Broadcasting Companies, Inc. v. American Federation of Television and Radio Artists, 412 F. Supp. 1077, 1084 (S.D.N.Y. 1976). Because arbitration clauses are governed by ordinary contract principles, numerous kinds of conduct may evince an intent to be bound by the arbitration clause. Fisser, 282 F.2d at 233. For example, as here, a party may seek to enforce rights derived from other provisions of the agreement and

Get a Document - by Citation - 1989 U.S. Dist. LEXIS 7317          Page 5 of 5

Case 1:08-cv-03371-DAB     Document 36-6     Filed 08/22/2008     Page 6 of 6

thereby concede an intent to be bound by the entire agreement.

*Plaintiff's contention that he is entitled to seek enforcement of those provisions of the Standard Agreement favorable to him while avoiding unfavorable provisions is untenable as it runs contrary to fairness **[\*7]** and to common sense.* $^{HN6}$ *While the Federal Rules of Civil Procedure countenance inconsistent and alternative pleading, see FRCP 8 (e)(2), they surely do not sanction the adoption of some terms of an agreement a party seeks to enforce and the jettison of others. Plaintiff has unequivocally recognized his intent to be bound by the Standard Agreement through his acceptance of defendant's job offer after receiving a copy of the Standard Agreement. Moreover, his suing under the Standard Agreement bespeaks his acknowledgment of the contract. Therefore, plaintiff must accept the consequences of his acceptance.*

*CONCLUSION*

*For the foregoing reasons, the Court grants the defendant's motion to compel arbitration pursuant to 9 U.S.C. § 1 et seq. as to both counts of the complaint.*

*This action is stayed pending arbitration and is ordered placed on this Court's suspense docket. The Court instructs the parties to submit a list of three proposed arbitrators each by July 10, 1989.*

*SO ORDERED*

*Dated: New York, New York June 22, 1989*

Service: **Get by LEXSEE®**
Citation: **1989 us dist lexis 7317**
View: Full
Date/Time: Tuesday, August 5, 2008 - 10:43 PM EDT

* Signal Legend:
- Warning: Negative treatment is indicated
**Q** - Questioned: Validity questioned by citing refs
- Caution: Possible negative treatment
- Positive treatment is indicated
**A** - Citing Refs. With Analysis Available
**I** - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

*My Lexis™* | Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Out | Help



About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# APPENDIX E

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 12764          Page 1 of 12

Case 1:08-cv-03371-DAB    Document 36-7    Filed 08/22/2008    Page 2 of 13

**LexisNexis**® *Total Research System*

Switch Client ┊ Preferences ┊ Sign Out ┊ [?] Help

*My Lexis*™ ╲ Search ╲ Research Tasks ╲ Get a Document ╲ *Shepard's*® ╲ Alerts ╲ Total Litigator ╲ Transactional A

Service: **Get by LEXSEE®**
Citation: **2004 us dist lexis 12764**

*2004 U.S. Dist. LEXIS 12764, \**

ZAKS, et al. v. TES FRANCHISING ET AL.

No. 3:01cv2266 (JBA)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

2004 U.S. Dist. LEXIS 12764

July 9, 2004, Decided

**DISPOSITION:** Defendants' motion to compel arbitration and stay litigation granted as to both plaintiffs Zaks and Stephens.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff franchisees sued defendants, the franchiser and non-signatories, alleging fraud, fraudulent misrepresentation, negligent misrepresentation, and violations of state statutory law. The district court denied defendants' motions to stay litigation and compel arbitration. Pursuant to a stipulation, the appellate court remanded the actions to the district court. The district court vacated its rulings.

**OVERVIEW:** The franchise agreements that both franchisees signed included arbitration clauses, and pursuant to these agreements, defendants moved to stay the cases and compel arbitration. At the same time one franchisee signed the franchise agreement, he and the franchiser executed an addendum, which stated that, notwithstanding anything to the contrary in the franchise agreement, the franchise agreement required binding arbitration. Prior to signing the franchise agreements, both franchisees received Uniform Franchise Offering Circulars. The court found that the franchise agreements were ambiguous because one provision required virtually all disputes to be settled by arbitration and another provision provided that the parties agreed to submit any disputes between them to a court of competent jurisdiction. The court determined that the addendum unambiguously established that the claims of that franchisee were subject to arbitration. Also, the offering circular, although it was parol evidence and not part of the integrated agreement, established the contractual understanding between the other franchisee and the franchiser to submit claims to arbitration.

**OUTCOME:** The court granted defendants' motion to compel arbitration and stay litigation as to both franchisees.

**CORE TERMS:** franchise agreements, arbitration, offering, franchise, addendum, ambiguity, registration, residual, lawsuit, Disclosure Law, compel arbitration, arbitration agreement, franchisee, arbitrate, venue, arbitration provisions, parol evidence, non-signatory, construing, Franchise Act, competent jurisdiction, arbitrator, claims arising, quotation marks omitted, extrinsic evidence, contractual, invoked, agreement to arbitrate,

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 12764          Page 2 of 12

Case 1:08-cv-03371-DAB     Document 36-7     Filed 08/22/2008     Page 3 of 13

nonsignatory, enforceable

**LEXISNEXIS® HEADNOTES**                                    ⊟ **Hide**

Business & Corporate Law > Distributorships & Franchises > Franchise Relationships >
Franchise Agreements

Contracts Law > Contract Interpretation > General Overview
*HN1* When there are multiple writings regarding the same transaction, the writings
should be considered together in construing the contract.  More Like This Headnote

Business & Corporate Law > Distributorships & Franchises > Alternative Dispute Resolution
Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview
Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods
*HN2* The Maryland Court of Appeals sees nothing inherent in the legislative policy of
the Franchise Registration and Disclosure Law which is inconsistent with the
enforcement of a valid arbitration agreement entered into by the parties to a
franchise contract. In fact, § 365B of the Franchise Act (current version as Md.
Code Ann., Bus. Reg. § 14-204 of the Franchise Registration and Disclosure Law)
states that the powers, remedies, procedures, and penalties of this subtitle are in
addition to and not in limitation of any other powers, remedies, procedures, and
penalties provided by law. Thus, because the Maryland Arbitration Act was in
existence prior to the promulgation of the Franchise Act, the language of § 365B
of the Franchise Act seems to clearly provide for, rather than eliminate, the ability
of the parties to agree to arbitrate disputes arising out of contracts that are
subject to the Franchise Act. The fact that the Franchise Act sets forth specific
penalties and provides for both civil and criminal liability in no way precludes the
right of the parties to a contract to agree to utilize arbitration to moderate their
disputes. The Maryland Court of Appeals also finds no indication in the legislative
history of the Franchise Act that the legislature intended to preclude arbitration of
disputes arising under contracts regulated by the Franchise
Act.  More Like This Headnote

Business & Corporate Law > Distributorships & Franchises > Alternative Dispute Resolution
Civil Procedure > Alternative Dispute Resolution > Mandatory ADR
Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement
*HN3* In the contract interpretation context, it is appropriate to take into account the
situation of the parties and the circumstances connected with the
transaction.  More Like This Headnote

Business & Corporate Law > Distributorships & Franchises > Franchise Relationships >
Franchise Agreements
Contracts Law > Contract Interpretation > General Overview
Contracts Law > Formation > Ambiguity & Mistake > General Overview
*HN4* The intent of the parties is to be ascertained by a fair and reasonable construction
of the written words and the language used must be accorded its common,
natural, and ordinary meaning and usage where it can be sensibly applied to the
subject matter of the contract. Where the language of the contract is clear and
unambiguous, the contract is to be given effect according to its terms. A court will
not torture words to import ambiguity where the ordinary meaning leaves no
room for ambiguity.  More Like This Headnote

Contracts Law > Contract Conditions & Provisions > Integration Clauses
Contracts Law > Defenses > Ambiguity & Mistake > General Overview

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 12764          Page 3 of 12

Case 1:08-cv-03371-DAB      Document 36-7      Filed 08/22/2008      Page 4 of 13

Evidence > Documentary Evidence > Parol Evidence

**HN5** The parol evidence rule is premised upon the idea that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages, etc., in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme. The rule prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated contract, viewing such evidence as legally irrelevant. Nonetheless, such evidence may still be admissible if relevant (1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > General Overview
Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement

**HN6** The "contra preferentem" doctrine is often viewed as a rule of "last resort." More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview
Civil Procedure > Alternative Dispute Resolution > Mandatory ADR
Contracts Law > Contract Conditions & Provisions > Arbitration Clauses

**HN7** Under Second Circuit law, claims against non-signatories to an arbitration agreement may also be subject to mandatory arbitration, where the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed. Courts in the Second Circuit and other circuits consistently have held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview
Contracts Law > Contract Conditions & Provisions > Arbitration Clauses
Contracts Law > Types of Contracts > Express Contracts

**HN8** Absent an express agreement to arbitrate, the United States Court of Appeals for the Second Circuit has recognized only limited theories upon which it is willing to enforce an arbitration agreement against a nonsignatory. But these limitations are inapplicable where it is the non-signatory that seeks to invoke the arbitration clause. The issue then is not whether non-signatories to the agreement can be compelled to arbitrate; rather, it is whether these non-signatories may compel plaintiff, admittedly a party to the contract, to arbitrate. More Like This Headnote

Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability
Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act >
Arbitration Agreements
Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods

**HN9** There is a strong presumption in favor of arbitration where an agreement to arbitrate exists. 9 U.S.C.S. § 2. An agreement to arbitrate shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. 9 U.S.C.S. § 2. More Like This Headnote

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 12764                    Page 4 of 12

Case 1:08-cv-03371-DAB    Document 36-7    Filed 08/22/2008    Page 5 of 13

**COUNSEL:** **[*1]** For Steven Zaks, Plaintiff: John Q. Gale, Gale & Kowalyshyn LLC, Hartford, CT. Mark J. Klein, Kansas City, MO.

For T. Barry Stephens, Consolidated Plaintiff: John Q. Gale, Gale & Kowalyshyn LLC, Hartford, CT.

For TES Franchising LLC, Entrepreneur's Source, Inc., Terry Powell, Defendants: Alec G, Sohmer, Alec G Sohmer & Assoc., Brockton, MA. Scott C. Kern, New Haven, CT.

For TES Franchising LLC, Entrepreneur's Source, Inc., Terry Powell, Consolidated Defendants: Alec G, Sohmer, Alec G Sohmer & Assoc., Brockton, MA.

**JUDGES:** Janet Bond Arterton, U.S.D.J.

**OPINION BY:** Janet Bond Arterton

**OPINION**

***Ruling on Defendants' Motion to Stay Litigation and Compel Arbitration [Doc. # 58]***

**I. Background**

Plaintiffs Steven Zaks ("Zaks") and T. Barry Stephens ("Stephens"), franchisees of defendant TES Franchising, LLC ("TES"), each filed suit against defendant TES, The Entrepeneur's Source, Inc. ▾ and Terry Powell (collectively, the "Defendants"), alleging fraud and fraudulent misrepresentation, negligent misrepresentation, and violations of the Connecticut Unfair Trade Practices Act and Maryland Franchise Registration and Disclosure Law. The franchise agreements that both Zaks and **[*2]** Stephens signed included arbitration clauses, and pursuant to these agreements, the defendants moved to stay the cases and compel arbitration. In rulings issued on July 10 and August 22, 2002, this Court denied defendants' motions, and on October 3, 2002, the Court consolidated the two cases.

Defendants subsequently appealed this Court's rulings to the Second Circuit, where the cases were consolidated for hearing on November 12, 2002. During the appeal, issues arose as to what documents were properly included in the record. In particular, the Court of Appeals record included an addendum to Zaks' Franchise Agreement and Uniform Franchise Offering Circulars signed by both plaintiffs, which was missing from the record before this Court. At a pre-trial conference with this Court on April 8, 2003, the parties agreed to withdraw the appeals pending before the Second Circuit so that this Court could decide the arbitration issue with all contested documents in the record. The parties filed a stipulation of dismissal on July 21, 2003, and on August 5, 2003, the Second Circuit dismissed the appeals and remanded the actions to this Court. This Court vacated its earlier rulings on defendants' **[*3]** motions to compel arbitration and stay litigation, and set a new schedule for the filing of new motions to compel arbitration.

The franchise agreements that both Zaks and Stephens signed are identical in the following respects. Section XX, entitled "Arbitration," provides that:

> All disputes and claims relating to this Agreement, the rights and obligations of the parties hereto, or any claims or causes of action relating to the performance of either party, and/or the purchase of franchise goods by Consultant Franchisee [plaintiffs] will be settled by arbitration . . . .

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 12764                    Page 5 of 12

Case 1:08-cv-03371-DAB    Document 36-7    Filed 08/22/2008    Page 6 of 13

P20.01.

Section XX includes two exceptions to the arbitration requirement. Paragraph 20.03 provides that "notwithstanding the foregoing, the arbitrator will have no jurisdiction over disputes relating to the ownership, validity, or registration of any mark, trade secret or copyright of Franchisor . . . . " Paragraph 20.05, moreover, allows the Franchisor to obtain preliminary injunctive relief or prejudgment remedies "to safeguard and protect Franchisor's interest prior to the filing of any arbitration proceeding . . . ". It is undisputed that the exceptions are not at issue in this case.

Two sections **[\*4]**  later, in the "Miscellaneous" section (XXII) of the agreement, the following provision appears:

> Except to the extent governed by United States trademark laws, this franchise agreement is to be construed and interpreted in accordance with the laws of the State of Connecticut. Consultant Franchisee and Franchisor hereby agree to submit any disputes between them to the jurisdiction and venue of a court of competent jurisdiction in the State of Connecticut, New Haven County.

Agreement, P22.01(a). [1]

---

**FOOTNOTES**

[1] In the Zaks' Franchise Agreement, Paragraph 22.01(a) contains the following additional sentence: "You may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law."

---

Prior to signing the Franchisee Agreements, both Zaks and Stephens received Uniform Franchise Offering Circulars. *See* Steven Zaks' and T. Barry Stephens' Offering Circular Receipts [Doc. # 58, Exs. 5, 8]. The Circulars, which the Federal Trade Commission requires as disclosures to **[\*5]**  potential franchisees, include the following provision:

> The Franchise Agreement requires that all disagreements be settled by arbitration in Connecticut. Out of State arbitration may force you to accept a less favorable settlement for disputes. It may also cost you more to arbitrate with us in Connecticut than in your home state.

Steven Zaks' and T. Barry Stephens' Uniform Franchise Offering Circulars [Doc. # 58, Ex. 6 at 2; Ex. 9 at 2].

At the same time Zaks signed the Franchise Agreement, he and TES also executed an addendum, which stated:

> Notwithstanding anything to the contrary in the Franchise Agreement to which this Addendum is attached, the following terms and conditions shall control: . . . The Franchise Agreement requires binding arbitration. The Arbitration will occur in Connecticut as the arbitrators shall agree. It is presumed that costs shall be split unless awarded to one party by the arbitrators. This provision may not be enforceable under California law.

Zaks' Franchise Agreement Addendum [Doc. # 58, Ex. 4] at CA-33.

## II. Discussion

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 12764          Page 6 of 12

Case 1:08-cv-03371-DAB     Document 36-7     Filed 08/22/2008     Page 7 of 13

The Court's prior rulings concluded that the Franchise Agreements that Zaks and Stephens **[*6]** signed were ambiguous in that Section XX provision required virtually all disputes to be settled by arbitration, and Paragraph 22.01 provides that the parties agreed to submit any disputes between them to a court of competent jurisdiction. This Court concluded that the contractual terms could not be reconciled because Paragraph 22.01 contained no limitation or explanation indicating that it is applicable only to trademark disputes or otherwise subject to the arbitration provisions of Section XX, and instead plainly provided that "any disputes" are to be decided by a court of competent jurisdiction. Thus, what the arbitration provision expressly provided appeared to be taken away by the separate provision that all disputes be submitted to a court of competent jurisdiction. Construing the ambiguity in the Franchise Agreement against the drafter, *see Hartford Elec. Applicators of Thermalux, Inc. v. Alden, 169 Conn. 177, 182, 363 A.2d 135 (1975)* (citation omitted), the Court denied the defendants' motions to compel arbitration. This Court's earlier rulings did not address the existence of the Zaks Franchise Agreement Addendum or the Uniform Franchise Offering Circulars, **[*7]** which were not then part of the record.

For the reasons discussed below, this Court now concludes that the Addendum that Zaks and TES executed simultaneously with the Franchise Agreement unambiguously establishes that Zaks' claims are subject to arbitration. Further, the Offering Circular that Stephens signed resolves the ambiguity in his Franchise Agreement, establishing the contractual understanding between Stephens and TES to submit claims to arbitration. Accordingly, upon reconsideration, defendants' motion to compel arbitration and stay litigation is granted.

## A. Addendum

The Addendum that Zaks and Terry Powell, Chief Executive Officer of TES, executed along with the Franchise Agreement on November 29, 2000 is unambiguous that "notwithstanding anything to the contrary in the [Zaks] Franchise Agreement . . . the Franchise Agreement requires binding arbitration. . . ." Zaks' Franchise Agreement Addendum [Doc. # 58, Ex. 4] at CA-33. *HN1* "When there are multiple writings regarding the same transaction, the writings should be considered together in construing the contract." *United Illum. Co. v. Wisvest-Connecticut, LLC, 259 Conn. 665, 671, 791 A.2d 546 (2002)* **[*8]** (quoting *Mongillo v. Commissioner of Transp., 214 Conn. 225, 229, 571 A.2d 112 (1990)*). Here, the categorical use of the phrase "notwithstanding anything to the contrary," obviates the tension between Section XX and Paragraph 22.01(a) in the Franchise Agreement, and clarifies that Zaks and TES had a contractual understanding to submit all disputes and claims relating to the Franchise Agreement to arbitration. Given the use of the term "notwithstanding," plaintiff's argument that the Addendum served merely to recite the fact that there is an arbitration provision in the Franchise Agreement, not to trump Paragraph 22.01(a), is unavailing.

Plaintiffs argue more particularly, however, that construing the Addendum as superceding any contrary terms in the Franchise Agreement would (1) render meaningless an additional provision in Zaks' Franchise Agreement, and (2) violate the requirements of Maryland law, where Zaks' franchise was registered. Paragraph 22.01(a) of Zak's Franchise Agreement contains the following additional provision, appearing as the last sentence in the paragraph, which was added to the Franchise Agreement to ensure compliance with Maryland's Franchise **[*9]** Registration and Disclosure Law:

> You may bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.

By construing the Franchise Agreement to require arbitration and thus giving effect to Section XX, Paragraph 22.01(a) would necessarily be deemed a mere residual venue clause,

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 12764

Page 7 of 12

Case 1:08-cv-03371-DAB    Document 36-7    Filed 08/22/2008    Page 8 of 13

applied only after the terms of arbitration in Section XX are given full effect, a construction that plaintiffs contend is inconsistent with Paragraph 22.01(a)'s additional provision regarding the bringing of a lawsuit in Maryland. Plaintiffs argue that if the parties in fact had intended Paragraph 22.01(a) to be a residual venue provision, then Zaks and TES would have more appropriately added the Maryland lawsuit provision to Article XX, where all of the exceptions to arbitration are listed. In plaintiffs' view, the addition of the Maryland lawsuit provision to Paragraph 22.01(a) is meaningless if the paragraph is viewed as a residual clause, as it would mean that the right to file suit in Maryland would arise only if Zaks otherwise overcame arbitrability under Article XX of his Franchise Agreement. According to plaintiffs, "the TES parties would **[*10]** thus have failed to satisfy one of the conditions for registration of their franchise offering in Maryland, that they 'permit a franchise to bring a lawsuit in Maryland for claims arising under the Maryland Franchise Registration and Disclosure Law.'" Plaintiff's Memorandum Opposing Defendants' Motion to Stay Litigation and Compel Arbitration (II) [Doc. # 59] at 28.

The plain language of the Maryland lawsuit provision in Paragraph 22.01(a), however, is consistent with a residual venue provision. Indeed, the use of the word "lawsuit" is revealing; a reasonable construction of the provision would be that the parties consent to be sued in Maryland (in addition to Connecticut), subject to the arbitration constraints to which they have also agreed. Thus, any claim outside the scope of or among the exceptions to the arbitration provision, or any claim for judicial review subsequent to an arbitration decision, could under the Agreement be brought in Maryland if the claim was based on the Maryland Franchise Registration and Disclosure Law. Plaintiffs' argument is based on the mistaken assumption that the Maryland Franchise Registration and Disclosure Law prohibits arbitration, or is otherwise **[*11]** inconsistent with a contractual agreement between parties to arbitrate most claims arising out of the contract. Plaintiffs cite no authority for its assumption. The Court of Appeals of Maryland, however, has addressed the precise issue of whether claims of violations of the Maryland Franchise Registration and Disclosure Law permit the franchisee to avoid an arbitration agreement in a contract. In *Holmes v. Coverall North America*, 336 Md. 534, 550-51, 649 A.2d 365 (1994), the Maryland Court of Appeals concluded:

> *HN7* We see nothing inherent in this legislative policy [of the Franchise Registration and Disclosure Law] which is inconsistent with the enforcement of a valid arbitration agreement entered into by the parties to a franchise contract. In fact, § 365B of the Franchise Act [2] states that 'the powers, remedies, procedures, and penalties of this subtitle are in addition to and not in limitation of any other powers, remedies, procedures, and penalties provided by law.' Thus, because the Maryland Arbitration Act was in existence prior to the promulgation of the Franchise Act, [3] the language of § 365B of the Franchise Act seems to clearly provide for, rather **[*12]** than eliminate, the ability of the parties to agree to arbitrate disputes arising out of contracts that are subject to the Franchise Act. The fact that the Franchise Act sets forth specific penalties and provides for both civil and criminal liability in no way precludes the right of the parties to a contract to agree to utilize arbitration to moderate their disputes. We also find no indication in the legislative history of the Franchise Act that the legislature intended to preclude arbitration of disputes arising under contracts regulated by the Franchise Act.

*Id.* at 550-551.

Because the Maryland lawsuit provision in Paragraph 22.01(a) is consistent with the arbitration provision in Section XX, and construing this provision as a residual clause would not be contrary to Maryland law, plaintiffs' argument lacks merit.

**FOOTNOTES**

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 12764          Page 8 of 12

Case 1:08-cv-03371-DAB    Document 36-7    Filed 08/22/2008    Page 9 of 13

**2** The Maryland Franchise Act was renamed the Maryland Franchise Regulation and Disclosure Law in 1992, and the sections were renumbered. Thus, Section 365B of the Franchise Act is now numbered Section 14-204 of the Franchise Regulation and Disclosure Law, but has otherwise not been changed in substance. **[*13]**

**3** Similarly, the Federal Arbitration Act, enacted in 1947, was in existence prior to the Maryland Franchise Act, enacted in 1977. *See* 9 U.S.C. § 2 et seq.

Plaintiffs also argue that the sole purpose of the Addendum was to recite certain exceptions to the Franchise Agreement required by state franchise administrators as a condition of the registration of the franchise in their states. Thus, plaintiffs contend that the addendum should be interpreted to read: "Notwithstanding anything in the Franchise Agreement requiring arbitration of disputes between the parties at a location in Connecticut, as the arbitrators may agree, and that the losing party may be required to pay costs of the arbitration proceedings, these provisions may not be enforceable as to franchisees in California." Plaintiffs' Memorandum Opposing Defendants; Motion to Stay Litigation and Compel Arbitration (II) [Doc. # 59] at 27-28. While *HN3* it is appropriate to take into account "the situation of the parties and the circumstances connected with the transaction," *Lawson v. Whitey's Frame Shop*, 241 Conn. 678, 686, 697 A.2d 1137 (1997), **[*14]** and thus appropriate to acknowledge that the Addendum was included to ensure compliance with state franchise registration requirements, plaintiffs' construction would contravene the plain language of the Addendum. *HN4* "The intent of the parties is to be ascertained by a fair and reasonable construction of the written words and ... the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract.... Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." *Id.* at 686. Here, the Addendum contains the explicit proviso "Notwithstanding anything *to the contrary* in the Franchise Agreement . . . ." Zaks' Franchise Agreement Addendum [Doc. # 58, Ex. 4] at CA-33 (emphasis added). Plaintiffs' construction would require the Court to disregard this clause, and is thus not a permissible interpretation.

As a result, the Court finds that when construed with the aid of the Addendum, the Zaks Franchise Agreement requires **[*15]** arbitration.

## B. Offering Circular

Defendants argue that the Offering Circulars received by both plaintiffs prior to the execution of the Franchise Agreements should be viewed in the same manner as the Addendum that Zaks signed simultaneously with the Franchise Agreement. The Offering Circulars, however, are distinguishable from the Addendum, and present a more difficult question. The Offering Circulars are required disclosures made to prospective franchisees prior to entering into a Franchise contract. While the Offering Circular offers a summary of the terms of the Franchise Agreement, it does not purport to supercede the terms of the Franchise Agreement, as the Addendum accomplished with the use of the phrase "Notwithstanding anything to the contrary . . . ." Moreover, unlike the Addendum that Zaks executed, the Offering Circular was signed by Stephens, acknowledging his receipt, over two weeks before his Franchise Agreement with TES was executed. The Offering Circular, therefore, is not part of the final integrated agreement between the parties. As Section XIX of the Franchise Agreement provides:

This Franchise Agreement and all ancillary agreements executed contemporaneously **[*16]** herewith the entire agreement between the parties,

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 12764          Page 9 of 12

Case 1:08-cv-03371-DAB     Document 36-7     Filed 08/22/2008     Page 10 of 13

and there are no other oral or written understandings or agreements between Franchisor and Consultant Franchisee.

Franchise Agreement, Section XIX: Integration of Agreement [Doc. # 58, Ex. 7] at 32.

In short, the Offering Circular is parol evidence, and therefore may not be considered unless the Offering Circular may be viewed as clarifying an ambiguity in the contract rather than contradicting terms of the contract.

HN5 The parol evidence rule "is premised upon the idea that when the parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed, that the whole engagement of the parties, and the extent and manner of their understanding, was reduced to writing. After this, to permit oral testimony, or prior or contemporaneous conversations, or circumstances, or usages [etc.], in order to learn what was intended, or to contradict what is written, would be dangerous and unjust in the extreme. *TIE Communications, Inc. v. Kopp,* 218 Conn. 281, 288, 589 A.2d 329 (1991) (citations **[*17]** and internal quotation marks omitted). The rule prohibits the use of extrinsic evidence to vary or contradict the terms of an integrated contract, viewing such evidence as legally irrelevant. *See Alstom Power, Inc. v. Balcke-Durr, Inc.,* 269 Conn. 599, 849 A.2d 804, 2004 WL 1291977, at *4 (Conn. 2004)*("Generally, . . . we continue to adhere to the general principle that the unambiguous terms of a written contract containing a merger clause may not be varied or contradicted by extrinsic evidence.") (citation and internal quotation marks omitted). Nonetheless, "such evidence may still be admissible if relevant (1) to explain an ambiguity appearing in the instrument; (2) to prove a collateral oral agreement which does not vary the terms of the writing; (3) to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement; or (4) to show mistake or fraud. . . ." *TIE Communications,* 218 Conn. at 288 (citations and internal quotation marks omitted). The issue here thus is whether the Offering Circular clarifies the ambiguity in the Franchise Agreement. [4]

**FOOTNOTES**

[4] The Court notes that neither party has requested the equitable remedy of reformation of the contract on grounds of mutual mistake or scrivener's error. Accordingly, the Court declines to consider such a remedy and will treat the issue as one of contract interpretation.

**[*18]** As this Court's previous ruling discussed, the terms of the Franchise Agreement are ambiguous, as plaintiff's view that Paragraph 22.01(a) removes the arbitration obligation in Section XX by allowing any dispute between the parties to be submitted to a court of competent jurisdiction is as equally reasonable as the defendant's view that Paragraph 22.01 (a) represents a residual venue clause to be invoked only after fulfillment of the arbitration obligations in Section XX. The Offering Circular, to which a copy of the Franchise Agreement identical to that which Stephens signed is attached, aids the resolution of this ambiguity. Most notably, the Offering Circular summarizes the terms of the Franchise Agreement to state that "the Franchise Agreement requires that all disagreements be settled by arbitration in Connecticut," Stephens' Offering Circular [Doc. # 58, Ex. 9], signifying the intent of the parties to submit disputes to arbitration and Stephens' acknowledgement of arbitration as a "risk factor" to signing the Franchise Agreement. *Id.* The Offering Circular also supports defendants' view that Paragraph 22.01(a) is a residual venue clause. It states in summary, for example, **[*19]** that "the Franchise Agreement requires that any legal actions be brought in Connecticut. . . ." *Id.* By using the phrase "legal actions," the Offering Circular narrows and limits what the parties intended to mean by their phrase "any disputes" in

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 12764                    Page 10 of 12

Case 1:08-cv-03371-DAB     Document 36-7     Filed 08/22/2008     Page 11 of 13

Paragraph 22.01 of the Franchise Agreement itself. [5] The defendants' construction is given further support as the Circular identifies Paragraph 22.01 as a "choice of forum" and "choice of law" provision. *See* Offering Circular [Doc. # 58, Ex. 9] at 21. Taken as a whole, the Offering Circular's descriptions of the Franchise Agreement serve to resolve the ambiguity in the Franchise Agreement in defendants' favor. The arbitration provisions in Section XX were intended to be given effect first, after which the choice of forum and choice of law provisions of paragraph 22.01 could be invoked.

FOOTNOTES

[5] The parties' intended meaning in this section is an accepted limitation of the term. For example, dispute has been defined as "[a] conflict or controversy, esp. one that has given rise to a particular lawsuit." Blacks Law Dictionary 485 (7th Ed. 1999). While this meaning of the term would be more limited than the apparently broader use of "disputes" in Section XX, the fact that the parol evidence strongly indicates the parties intended Paragraph 22.01(a) to be a residual clause invoked only after Section XX was given full effect, removes the seeming inconsistency.

**[\*20]**  Construing Paragraph 22.01(a) as a residual clause does not improperly vary or contradict the meaning of the Franchise Agreement, because its meaning without reference to the parol evidence was unclear. *See, e.g. Bead Chain Manufacturing Co. v. Saxton Products, Inc., 183 Conn. 266, 273-74, 439 A.2d 314 (1981)* (concluding that ambiguity in purchase order arising from typed term providing buyer with "exclusive use" but printed term apparently providing buyer with "ownership" could be resolved by use of parol evidence if parol evidence serves "to clarify the meaning of the integrated contract."); *United Illuminating Co. v. Wisvest-Connecticut, LLC., 259 Conn. 665, 674, 791 A.2d 546 (2002)* (concluding that ambiguity in power supply agreement and Hydro-Quebec agreement properly resolved by extrinsic evidence); *Shawmut Bank Connecticut, N.A. v. Connecticut Limousine Service, Inc., 40 Conn.App. 268, 275, 670 A.2d 880 (1996)* (holding that parol evidence offered "to determine which of the references to events of default found in the two transfer of voting power provisions should be given effect," properly served to aid interpretation).  **[\*21]**  As such, the Offering Circular resolves the ambiguity in the Franchise Agreement and establishes that the parties intended to arbitrate disputes. [6]

FOOTNOTES

[6] This Court's prior ruling concluded that the Section XX and Paragraph 22.01 could not be reconciled. The clarifying extrinsic evidence has now persuaded the Court that the provisions may in fact be properly reconciled by deeming Paragraph 22.01 a residual venue clause.

This Court's previous ruling ultimately relied on the rule of construction that ambiguous provisions in a contract are to be interpreted against the drafter. *See, e.g. Hartford Elec., 169 Conn. at 182*. Because the ambiguity may be resolved by reference to the Zaks' Addendum and the Stephens' Offering Circular, *HN6* the "contra preferentem" doctrine, often viewed as a rule of "last resort," need not be invoked. *See O'Neil v. Retirement Plan for Salaried Employees of RKO General, Inc., 37 F.3d 55, 61 (2d Cir. 1994)* (citations and internal quotation marks omitted).

**[\*22] C. Enforcement of Arbitration by Non-Signatories to the Arbitration Agreement**

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 12764          Page 11 of 12

Case 1:08-cv-03371-DAB     Document 36-7     Filed 08/22/2008     Page 12 of 13

Plaintiff's suit makes claims against two parties who were not signatories to the Franchise Agreement: Terry Powell as CEO of TES, and The Entrepreneurs' _Source, Inc._ ▾ *HN7*⚓ "Under Second Circuit law, claims against non-signatories to an arbitration agreement may also be subject to mandatory arbitration, where 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.' " _Gambardella v. Pentec, Inc., 218 F. Supp. 2d 237, 241 (D.Conn. 1997)_ (quoting _Choctaw Generation Ltd. Partnership v. American Home Assurance Co., 271 F.3d 403, 404 (2d Cir. 2001)_ (internal quotations omitted)). "Courts in this and other circuits consistently have held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement." _Campaniello Imports Inc. v. Saporiti Italia S.p.A., 117 F.3d 655, 669 (2d Cir. 1997)_ (quoting _Roby v. Corporation of Lloyd's, 996 F.2d 1353, 1360 (2d Cir. 1993)_). Thus, in _Campaniello_, the Second Circuit **[*23]** "held that claims against an individual employee that arose out of the relationship between plaintiff and that individual's employer, which was the subject of a mandatory arbitration agreement, were also subject to mandatory arbitration." _Gambardella, 218 F. Supp. 2d at 241-42 (D.Conn. 1997)._

Here, defendants argue that as in _Gambardella_, plaintiffs' claims against the non-signatories are all directly related to their relationship with TES and to the plaintiffs' claims against TES, which are undisputedly within the scope of the arbitration agreement. Plaintiffs acknowledge that they stated in their complaints that the TES Parties "have no separate recognizable legal identities for the purposes of this action." Complaint [Doc. # 1] at P9. Plaintiffs rely, however, on _Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 780 (2d Cir. 1995)_, for the proposition that *HN8*⚓ absent an express agreement to arbitrate, the Court has recognized only "limited theories upon which [it] is willing to enforce an arbitration agreement against a nonsignatory." _Id._ But the limitations observed in _Thompson_ are inapplicable where, as here, "it is the non-signatory **[*24]** that seeks to invoke the arbitration clause." _Choctaw, 271 F.3d at 406._ The issue then, as in _Gambardella_, "is not whether non-signatories to the agreement can be compelled to arbitrate; rather, it is whether these non-signatories may compel plaintiff, admittedly a party to the contract, to arbitrate." _Gambardella, 218 F. Supp. 2d at 243._ The Court concludes that the nonsignatories to the Franchise Agreements may enforce the arbitration agreement.

Plaintiffs also allege that they will be irreparably harmed if they are required to arbitrate their claims because they will not (1) be able to join their actions in a single more cost- effective proceeding, as they must arbitrate first against only TES and then, in a separate action, against the other two defendants; (2) be able to join forces with each other in a single most cost-effective proceeding; and (3) be able to seek class action certification. Given *HN9*⚓ the strong presumption in favor of arbitration where an agreement to arbitrate exists, plaintiffs' arbitration case management concerns are unavailing. [7] _See_ _9 U.S.C. § 2_ (agreement to arbitrate "shall be valid, irrevocable, **[*25]** and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"); _Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela, 991 F.2d 42, 45 (2d Cir. 1993)_ ("Where a court is satisfied that a dispute before it is arbitrable, it must stay proceedings and order the parties to proceed to arbitration.").

---

**FOOTNOTES**

[7] The parties give no indication that these case management concerns could not be raised to or considered by the arbitrators.

---

## III. Conclusion

For the foregoing reasons, defendants' Motion to Compel Arbitration and Stay Litigation is hereby GRANTED as to both plaintiffs Zaks and Stephens.

Get a Document - by Citation - 2004 U.S. Dist. LEXIS 12764          Page 12 of 12

Case 1:08-cv-03371-DAB     Document 36-7     Filed 08/22/2008     Page 13 of 13

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this 9th day of July, 2004.**

    Service: **Get by LEXSEE®**
    Citation: **2004 us dist lexis 12764**
       View: Full
Date/Time: Tuesday, August 5, 2008 - 10:45 PM EDT

* Signal Legend:

 -   Warning: Negative treatment is indicated

**Q** -   Questioned: Validity questioned by citing refs

⚠ -   Caution: Possible negative treatment

✚ -   Positive treatment is indicated

**A** -   Citing Refs. With Analysis Available

**i** -   Citation information available

* Click on any *Shepard's* signal to *Shepardize®* that case.

*My Lexis™* | Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional
Advisor | Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Out | Help

⬤ LexisNexis®     About LexisNexis  | Terms & Conditions  | Contact Us
Copyright ©   2008 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.